**UNITED RENTALS, INC., Plaintiff,**

v.

**RAM HOLDINGS, INC., and Ram Acquisition Corp., Defendants.**

Civil Action No. 3360–CC.

Court of Chancery of Delaware.

Submitted: Dec. 19, 2007.

Decided: Dec. 21, 2007.

Collins J. Seitz, Jr., Matthew F. Boyer, and Christos T. Adamopoulos, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; of Counsel: Richard D. Bernstein, Tariq Mundiya, and John R. Oller, of Willkie Farr & Gallagher LLP, New York, New York; Leslie A. Lupert, Thomas A. Brown II, and Timothy D. Sini, of Orans, Elsen & Lupert LLP, New York, New York; Roger E. Schwed, of United Rentals, Inc., Greenwich, Connecticut, Attorneys for Plaintiff.

Gregory P. Williams, Raymond J. DiCamillo, Richard P. Rollo, and John D. Hendershot, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Of

Counsel: Michael L. Hirschfeld, Scott A. Edelman, and Daniel M. Perry, of Milbank, Tweed, Hadley & McCloy LLP, New York, New York; Stuart L. Shapiro, of Shapiro, Forman, Allen, Sava & McPherson LLP, New York, New York, Attorneys for Defendants.

## *OPINION*

CHANDLER, Chancellor.

In classical mythology, it took a demi-god to subdue Cerberus, the beastly three-headed dog that guarded the gates of the underworld.[1] In his twelfth and final labor, Heracles[2] journeyed to Hades to battle, tame, and capture the monstrous creature. In this case, plaintiff United Rentals, Inc. journeyed to Delaware to conquer a more modern obstacle that, rather than guards the gates to the afterlife, stands in the way of the consummation of a merger. Nevertheless, like the three heads of the mythological Cerberus, the private equity firm of the same name presents three substantial challenges to plaintiff's case: (1) the language of the Merger Agreement, (2) evidence of the negotiations between the parties, and (3) a doctrine of contract interpretation known as the forthright negotiator principle. In this tale the three heads prove too much to overcome.

First, the language of the Merger Agreement presents a direct conflict between two provisions on remedies, rendering the Agreement ambiguous and de-feating plaintiff's motion for summary judgment. Second, the extrinsic evidence of the negotiation process, though ultimately not conclusive, is too muddled to find that plaintiff's interpretation of the Agreement represents the common understanding of the parties. Third, under the forthright negotiator principle, the subjective understanding of one party to a contract may bind the other party when the other party knows or has reason to know of that understanding. Because the evidence in this case shows that defendants understood this Agreement to preclude the remedy of specific performance and that plaintiff knew or should have known of this understanding, I conclude that plaintiff has failed to meet its burden and find in favor of defendants.

## I. FACTUAL AND PROCEDURAL BACKGROUND[3]

On November 19, 2007, plaintiff United Rentals, Inc. ("URI" or the "Company") filed its complaint in this action. Thereafter, on November 29, 2007, URI moved for summary judgment. In its motion for summary judgment, URI sought an order from this Court specifically enforcing the terms of the July 22, 2007 "Agreement and Plan of Merger" (the "Merger Agreement" or the "Agreement") among URI and defendants RAM Holdings, Inc. ("RAM Holdings") and RAM Acquisition Corp. ("RAM Acquisition" and, together with RAM Holdings, "RAM" or the "RAM Entities").[4]

---

1. Ancient sources disagree on the precise description of Cerberus. Homer's terse description in the *Iliad* labels it simply the hound of Hades. Apollodorus describes Cerberus as having three dog heads, the tail of a dragon, and a backside covered with snakes. In Hesiod's *Theogony*, Cerberus is characterized as a relentless, fifty-headed, flesh-eating, brazen-voiced hound.

2. Heracles is also commonly known as "Hercules," the Latin equivalent of Heracles.

3. These facts either are undisputed by the parties or are as found by the Court at trial.

4. Both because RAM is controlled by Cerberus, as defined below, and because the witnesses' testimony often does not distinguish among these Cerberus-controlled entities, I will sometimes refer to defendants as "Cerbe-

On December 13, 2007, this Court denied plaintiff's motion for summary judgment, finding that the question was exceedingly close.[5] A trial was therefore necessary to ascertain the meaning of the Agreement.

### A. The Parties

URI is a Delaware corporation with its principal place of business in Greenwich, Connecticut. Founded in 1997, it is a publicly traded company listed on the New York Stock Exchange. URI is the largest equipment rental company in the world based on revenue, earning $3.64 billion in 2006. The Company consists of an integrated network of over 690 rental locations in forty-eight states, ten Canadian provinces, and one location in Mexico. The Company serves construction and industrial customers, utilities, municipalities, homeowners and others. On or about May 18, 2007, URI offered itself up for sale through a draft merger agreement sent to potential buyers, including Cerberus Capital Management, L.P. ("CCM"). As a result of the negotiation process (discussed below), URI entered into the Merger Agreement. URI is a signatory to both the Merger Agreement and the Limited Guarantee.

Defendants RAM Holdings and RAM Acquisition are shell entities with *de minimis* assets that were formed solely to effectuate transactions contemplated under the Merger Agreement. Defendant RAM Holdings is a Delaware corporation. Defendant RAM Acquisition is also a Delaware corporation and is a direct, wholly-owned subsidiary of defendant RAM Holdings. RAM Acquisition, identified as "Merger Sub" in the Merger Agreement, the Limited Guarantee, and the Equity Commitment Letter, is a direct, wholly owned subsidiary of RAM Holdings, which is identified as "Parent" in the Agreements. The RAM Entities are controlled by funds and accounts affiliated with CCM, a major New York private equity buyout firm, which is not a party to the Merger Agreement or this lawsuit.

Cerberus Partners, L.P. ("Cerberus Partners"), an investment fund, is a limited partnership organized under the laws of the State of Delaware with its principal offices in New York, New York. Cerberus Partners, identified as the "Guarantor" in the Limited Guarantee, is a signatory only to the Limited Guarantee, under which it is the guarantor of certain payment obligations of the RAM Entities up to a maximum amount of $100 million plus incidental solicitation costs. Cerberus Partners is not a party to the Merger Agreement or to the Equity Commitment Letter, and it is not a defendant in this action. Venue and jurisdiction for any claim under the Limited Guarantee are exclusively in New York.[6]

CCM is a limited partnership organized under the laws of the State of Delaware with its principal offices in New York, New York. CCM is a management company that, together with other affiliated entities, manages investment funds, including Cerberus Partners (and, together with CCM, "Cerberus"). CCM, identified as the "Equity Sponsor" in the Equity Commitment Letter, is a signatory to only the Equity

---

rus," though Cerberus is *not* a party to this action; only RAM Holdings and RAM Acquisition are defendants in this case. *See* Section II of this opinion.

**5.** *United Rentals, Inc. v. RAM Holdings, Inc.,* C.A. No. 3360–CC, slip. op. at 1, 2007 WL 4465520 (Del.Ch. Dec. 13, 2007) (letter denying summary judgment).

**6.** Cerberus Partners and CCM filed an action against URI on November 12, 2007, in the Supreme Court of the State of New York, County of New York.

Commitment Letter, under which it agreed on behalf of one or more of its affiliated funds or managed accounts (which had not yet been designated) to purchase or cause to be purchased shares of capital stock of RAM Holdings for an aggregate purchase price of $1.5 billion (the "Equity Financing"), subject to the satisfaction of various conditions as more specifically set forth in the letter. CCM is not a party to the Merger Agreement or to the Limited Guarantee, and it is not a defendant in this action. The Equity Commitment Letter provides that venue and jurisdiction for any claim under the Limited Guarantee are exclusively in New York.

### B. The Merger Agreement

In the spring of 2007, URI's board of directors decided to explore strategic alternatives to maximize stockholder value, including by soliciting offers from third parties to buy the Company. After an exhaustive effort that lasted several months, the board of directors authorized URI to execute the Merger Agreement, which it did on July 22, 2007.[7] Under the Merger Agreement, RAM committed to purchase all of the common shares of URI for $34.50 per share in cash, for a total transaction value of approximately $7 billion, which includes the repayment or refinance of URI's existing debt. Under the Merger Agreement, RAM Acquisition is to be merged into URI, which will be the surviving corporation.

### C. Relevant Provisions of the Agreements

The Merger Agreement contemplates that, in order to fund a portion of the Merger consideration, RAM Holdings will obtain financing through the sale of equity to CCM for an aggregate purchase price of not less than $1.5 billion under the Equity Commitment Letter. The signatories to the Equity Commitment Letter are CCM and RAM Holdings. The terms of the Equity Commitment Letter were negotiated with and accepted by URI, but URI is neither a party to nor a beneficiary of the Equity Commitment Letter.[8]

### 1. The Merger Agreement

The Merger Agreement contains two key provisions at issue in this case.[9] Section 9.10, entitled "Specific Performance," provides:

> The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, (a) [RAM Holdings] and [RAM Acquisition] shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement by the Company and to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy to which such party is entitled at law or in equity and (b) the Company shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement by [RAM Holdings] or [RAM Acquisition] or to enforce specifically the

---

7. See URI Proxy Statement at 22–32.

8. See Equity Commitment Letter at 1.

9. The Merger Agreement permits RAM to walk away from the deal in the event of a material adverse change in URI's business, but prohibits RAM from doing so based on the condition of the credit markets in this coun-

try. Section 3.1 of the Merger Agreement expressly provides that "Material Adverse Effect shall not include facts, circumstances, events, changes, effects or occurrences (i) generally affecting the economy or the financial, debt, credit or securities markets in the United States . . . ."

terms and provisions of this Agreement and the Guarantee to prevent breaches of or enforce compliance with those covenants of [RAM Holdings] or [RAM Acquisition] that require [RAM Holdings] or [RAM Acquisition] to (i) use its reasonable best efforts to obtain the Financing and satisfy the conditions to closing set forth in Section 7.1 and Section 7.3, including the covenants set forth in Section 6.8 and Section 6.10 and (ii) consummate the transactions contemplated by this Agreement, if in the case of this clause (ii), the Financing (or Alternative Financing obtained in accordance with Section 6.10(b)) is available to be drawn down by [RAM Holdings] pursuant to the terms of the applicable agreements but is not so drawn down solely as a result of [RAM Holdings] or [RAM Acquisition] refusing to do so in breach of this Agreement. *The provisions of this Section 9.10 shall be subject in all respects to Section 8.2(e) hereof, which Section shall govern the rights and obligations of the parties hereto (and of [Cerberus Partners], the Parent Related Parties, and the Company Related Parties) under the circumstances provided therein.*[10]

Section 8.2(e), referred to in the specific performance provision in section 9.10, is part of Article VIII, entitled "Termination, Amendment and Waiver." Article VIII provides specific limited circumstances in which either RAM or URI can terminate the Merger Agreement and receive a $100 million termination fee.[11] The relevant portion of section 8.2(e) of the Merger Agreement provides:

Notwithstanding anything to the contrary in this Agreement, including with respect to Sections 7.4 and 9. 10, (i) the Company's right to terminate this Agreement in compliance with the provisions of Sections 8.1(d)(i) and (ii) and its right to receive the Parent Termination Fee pursuant to Section 8.2(c) or the guarantee thereof pursuant to the Guarantee, and (ii) [RAM Holdings]'s right to terminate this Agreement pursuant to Section 8.1(e)(i) and (ii) and its right to receive the Company Termination Fee pursuant to Section 8.2(b) shall, in each case, be the sole and exclusive remedy, including on account of punitive damages, of (in the case of clause (i)) the Company and its subsidiaries against [RAM Holdings], [RAM Acquisition], [Cerberus Partners] or any of their respective affiliates, stockholders, general partners, limited partners, members, managers, directors, officers, employees or agents (collectively *"Parent Related Parties"*) and (in the case of clause (ii)) [RAM Holdings] and [RAM Acquisition] against the Company or its subsidiaries, affiliates, stockholders, directors, officers, employees or agents (collectively *"Company Related Parties"*), for any and all loss or damage suffered as a result thereof, and upon any termination specified in clause (i) or (ii) of this Section 8.2(e) and payment of the Parent Termination Fee or Company Termination Fee, as the case may be, none of [RAM Holdings], [RAM Acquisition], [Cerberus Partners] or any of their respective Parent Related Parties or the Company or any of the Company Related Parties shall have any further liability or obligation of any kind or nature relating to or arising out of this Agreement or the transactions contemplated

---

10. Merger Agreement § 9.10 (emphasis added).

11. Denominated the "Parent Termination Fee" when payable by RAM to URI, and the "Company Termination Fee" when payable by URI to RAM.

by this Agreement as a result of such termination.

. . .

In no event, whether or not this Agreement has been terminated pursuant to any provision hereof, shall [RAM Holdings], [RAM Acquisition], [Cerberus Partners] or the Parent Related Parties, either individually or in the aggregate, be subject to any liability in excess of the Parent Termination Fee for any or all losses or damages relating to or arising out of this Agreement or the transactions contemplated by this Agreement, including breaches by [RAM Holdings] or [RAM Acquisition] of any representations, warranties, covenants or agreements contained in this Agreement, and *in no event shall the Company seek equitable relief or seek to recover any money damages in excess of such amount from [RAM Holdings], [RAM Acquisition], [Cerberus Partners] or any Parent Related Party or any of their respective Representatives.*[12]

The parties dispute the effect of section 8.2(e) on section 9.10.

### 2. *The Equity Commitment Letter and Limited Guarantee*

The Equity Commitment Letter states that URI is not a third-party beneficiary:

There is no express or implied intention to benefit any third party including, without limitation, [URI] and nothing contained in this Equity Commitment Letter is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than [RAM Holdings].[13]

The Equity Commitment Letter also provides that any claim against CCM with respect to the transactions contemplated by the Merger Agreement or the Equity Commitment Letter be made only pursuant to the Limited Guarantee:

Under no circumstances shall [CCM] be liable for any costs or damages including, without limitation, any special, incidental, consequential, exemplary or punitive damages, to any Person, including [RAM Holdings] and [URI], in respect of this Equity Commitment Letter; and any claims with respect to the transactions contemplated by the Merger Agreement or this Equity Commitment Letter shall be made only pursuant to the Guarantee to the extent applicable.[14]

In executing the Merger Agreement with the RAM Entities, URI was contracting with shell companies that effectively had no assets.[15] Accordingly, to ensure that there would be some level of financial backing for the RAM Entities' obligations under the Merger Agreement accessible to URI, URI entered into the Limited Guarantee with Cerberus Partners. The execution of such a guarantee is "market practice" in LBO transactions sponsored by private equity firms. The Limited Guarantee provides that Cerberus Partners will guarantee payment, up to a maximum amount of $100 million plus certain solicitation expenses, of the enumerated payment obligations of the RAM Entities under the Merger Agreement.[16] Before accepting the Limited Guarantee, URI inquired into the financial resources of Cerberus Partners and satisfied itself that Cerberus Partners had the ability to make good on a claim thereunder. The Limited

12. Merger Agreement § 8.2(e) (emphasis added).

13. Equity Commitment Letter at 1.

14. *Id.*

15. Limited Guarantee ¶ 4(a).

16. *See id.* at ¶ 1(a).

Guarantee contains a representation by Cerberus Partners to this effect. The Limited Guarantee provides, in relevant part: [17]

> (a) . . . The Company, by its acceptance of the benefits hereof, agrees that it has no right of recovery in respect of a claim arising under the Merger Agreement or in connection with any documents or instruments delivered in connection therewith, including this Limited Guarantee, against any former, current or future officer, agent, affiliate or employee of [Cerberus Partners] or [RAM Holdings] (or any of their successors' or permitted assignees'), against any former, current or future general or limited partner, member or stockholder of the [Cerberus Partners] or [RAM Holdings] (or any of their successors' or permitted assignees'), notwithstanding that Guarantor is or may be a partnership, or any affiliate thereof or against any former, current or future director, officer, agent, employee, affiliate, general or limited partner, stockholder, manager or member of any of the foregoing (collectively, *"Guarantor/Parent Affiliates"*; it being understood that the term Guarantor/Parent Affiliates shall not include [Cerberus Partners], [RAM Holdings], or [RAM Acquisition] ), whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of [RAM Holdings] or [RAM Acquisition] against the Guarantor/Parent Affiliates, or otherwise, except for its rights under this Limited Guarantee and subject to the limits contained herein. . . .

> (b) Recourse against [Cerberus Partners] under this Limited Guarantee shall be the sole and exclusive remedy of the Company and all of its affiliates against [Cerberus Partners] and any Guarantor/Parent Affiliates in respect of any liabilities or obligations arising under, or in connection with, the Merger Agreement or the transactions contemplated thereby including in the event [RAM Holdings] or [RAM Acquisition] breaches any covenant, representation or warranty under the Merger Agreement or [Cerberus Partners] breaches a covenant, representation or warranty hereunder.[18]

These provisions were the result of negotiations that began from a May 18 bid contract and culminated in the final, executed Merger Agreement of July 22.

### 3. *Negotiation of the Merger Agreement* [19]

■ Throughout the course of negotiation of the Merger Agreement, URI contends that it communicated to RAM's principal attorney contract negotiator, Peter Ehrenberg of Lowenstein Sandler PC ("Lowenstein"), that URI wanted to restrict RAM's ability to breach the Merger Agreement and unilaterally refuse to close the transaction. URI further maintains that URI's counsel, Eric Swedenburg of Simpson Thacher & Bartlett LP ("Simpson"), made clear to Ehrenberg that it was very important to URI that there be "deal certainty" so that RAM could not simply refuse to close if debt financing was available.[20]

---

17. *Id.* at ¶ 4(a).

18. Limited Guarantee ¶ 4.

19. As explained later, an ambiguity in the contract requires the Court to consider extrinsic evidence.

20. Swedenburg Dep. 44–51. *See also* McNeal Dep. 105–08; Kochman Dep. 60.

On the other side of the negotiation table, the RAM entities argue that Ehrenberg consistently communicated that Cerberus had a $100 million walkway right and that URI knowingly relinquished its right to specific performance under the Merger Agreement.

### a. The Initial May 18, 2007 Draft of the Merger Agreement

On May 18, 2007, UBS Investment Bank ("UBS") provided bidders, including Cerberus Partners, with an initial draft of a Merger Agreement prepared by URI's deal counsel, Simpson.[21] Simpson's initial draft contemplated that two corporations, referred to as "Parent" and "Merger Sub," would be formed to effect a merger with URI, that a separate "Guarantor" would provide a guarantee "with respect to certain obligations of Parent and Merger Sub," and that Parent would supply an "equity commitment letter" between it and a third party.[22] The initial draft further provided that URI would be entitled "to enforce specifically the terms and provisions of this Agreement ... the Equity Commitment Letter and the Guarantee" that *require* Parent *or* Merger Sub to, *inter alia,* "pay the Equity Financing and consummate the transactions contemplated by this [Merger] Agreement ..."[23] This draft also required Parent to "consummate the Financing at or prior to the Closing (including by taking enforcement actions against the lenders and other persons providing the Financing to fund such Financing)."[24]

As is typical when a private equity sponsor (like Cerberus Partners) makes an acquisition, the initial draft of the Merger Agreement contemplated that the buyer under the merger agreement would be one or more newly formed "shell acquisition entities" formed by the sponsor.[25] The ability of these shell entities to consummate the transaction depends entirely upon their ability to obtain financing commitments—for both debt and equity—from other persons. The seller (here, URI) recognizes that its leverage to force a closing of the transaction depends entirely upon the rights it obtains under the equity commitment and/or guarantee. Simpson's draft of the Merger Agreement proposed to accomplish this by giving URI the right to seek specific performance of the equity commitment letter and by requiring the guarantee, and by requiring Parent to do so with respect to all financing commitments.[26]

### b. The June 18, 2007 Draft of the Merger Agreement

On June 18, 2007, CCM's counsel, Lowenstein, responded to URI, delivering to Simpson a mark-up of the initial draft Merger Agreement.[27] In that mark-up, Lowenstein indicated, among other things, that CCM would not provide a guarantee[28] and removed all references to the proposed guarantee. Lowenstein also removed the provisions stating that URI would have the right to enforce the equity commitment letter, and that Parent would

21. UBS was retained by URI to help facilitate its sale.

22. Defs.' Ex. 6 at 1, 22 (Draft Merger Agreement, May 18, 2007).

23. *Id.* at 48–49.

24. *Id.* at 36.

25. *See id.*

26. *Id.* at 48–49, 36–39.

27. Defs.' Ex. 9 (Draft Merger Agreement, June 18, 2007).

28. *Id.* at 1.

be required to take action against the Financing sources to compel them to fund.[29]

In the June 18, 2007 draft of the Merger Agreement proffered by RAM, Ehrenberg explicitly deleted the very detailed specific performance provisions of section 9.10 that ultimately appears in the final version.[30]

### c. The June 25, 2007 Draft of the Merger Agreement

On June 25, 2007, Simpson provided Lowenstein with a revised draft of the proposed form of Merger Agreement.[31] In that revised draft, Simpson sought to encourage CCM to alter its position in one of two ways: (1) provide a guarantee of the obligations of Parent to pay a reverse break-up fee (defined in the Merger Agreement as the "Parent Termination Fee") in the event that Parent or Merger Sub failed to close the transaction by the stated deadline (URI's sole and exclusive remedy in such circumstances); or (2) provide an unconditional equity commitment letter in favor of URI. Footnote 1 of Simpson's June 25, 2007 draft informed CCM as follows:

> In the event that Parent's obligations with respect to the Parent Termination Fee are not supported by a Guarantee from the prospective purchaser's fund, the prospective purchaser's bid will be significantly disadvantaged. This disadvantage would be less significant, however, if prospective purchaser's equity commitment letter unconditionally obligates purchaser's fund to fund any

amount necessary to satisfy Parent's obligations and provides third-party beneficiary rights to [URI] to enforce such letter.[32]

Simpson's June 25 draft also restored URI's ability to seek specific performance of the equity commitment letter and the obligation of Parent to take action against the Financing sources to compel them to fund.[33]

### d. The July 1, 2007 Draft of the Merger Agreement

On July 1, 2007, while waiting for a response to its June 25 draft, Simpson provided Lowenstein with a form of guarantee that it represented to be "consistent with what we have seen executed in a large number of recent sponsor-led deals."[34] Simpson's cover email explained:

> As discussed, in the event that Parent's obligations with respect to the Parent Termination Fee are not supported by a Guarantee that will significantly disadvantage your client's bid, although the disadvantage may be less significant if the equity commitment letter is along the lines discussed.[35]

The draft guarantee provided by Simpson was limited to a fixed payment amount, with the amount to be determined in negotiation. It also provided that the Guarantor would deliver an Equity Commitment Letter to Parent, that URI would be "an express third party beneficiary un-

---

29. *Id.* at 50, 66, 67.

30. Ehrenberg Test., Trial Tr. vol. 2, 333–35, Dec. 19, 2007 [hereinafter "Ehrenberg Test. at ——"].

31. Defs.' Ex. 11 (Draft Merger Agreement, June 25, 2007).

32. *Id.* at 1.

33. *Id.* at 40, 53.

34. Defs.' Ex. 12 at 1 (Draft Guarantee, July 1, 2007).

35. *Id.* In prior discussions, Simpson had indicated to Lowenstein that it was looking for an equity commitment letter with express third-party beneficiary rights in favor of URI. (Ehrenberg Test. at 344.)

der the Guarantor's Equity Commitment Letter," and that URI, as "the express third party beneficiary under the Guarantor's Equity Commitment Letter to Parent, may specifically enforce the terms of such letter agreement in connection with [URI's] exercise of" its specific performance rights under section 9.10 of the Merger Agreement.[36]

### e. The July 2, 2007 and July 4, 2007 Drafts of the Merger Agreement

On July 2, 2007, Lowenstein sent a revised draft of the Merger Agreement to Simpson. In its covering email, Lowenstein advised that CCM was reconsidering its prior unwillingness to provide a guarantee, although no final decision had been made.[37] Accordingly, although Lowenstein did not provide comments to the form of Guarantee received from Simpson the previous day, its July 2 draft of the Merger Agreement bracketed for further attention the text indicating that a Guarantor would provide a guarantee "of certain obligations of Parent and Merger Sub."[38] Lowenstein's July 2 draft again deleted from the Merger Agreement language that would have permitted URI to seek specific performance of the equity commitment letter and that would have required Parent to take action against the Financing sources to compel them to fund.[39]

On July 4, 2007, Simpson sent a revised draft Merger Agreement to Lowenstein.[40] Again, Simpson "reversed" Lowenstein's deletion of the text allowing URI to enforce the equity commitment letter and requiring Parent to pursue action to compel the Financing sources to fund.[41]

In oral communications during this period between the two law firms, Simpson indicated to Lowenstein that URI wanted to make sure it could collect the full amount of the equity commitment letter in the event that Parent had its debt financing available but refused to close. Lowenstein told Simpson that such an arrangement was not acceptable, and that the buyer was unwilling to accept any exposure in the event Parent did not close the transaction other than payment of a fee.[42] With the negotiations thus stalled, on July 10, 2007, Lowenstein attorneys Ehrenberg and Jeffrey Shapiro met with Simpson lawyers, including Swedenburg, and Emily McNeal, an Executive Director at UBS. At that meeting, Lowenstein again made clear that the buyer and its affiliates were unwilling to have any exposure beyond the payment of a break-up fee in the event that Parent failed to close the transaction. Swedenburg was not willing to agree, and this fundamental issue remained open.[43]

### f. The July 12, 2007 Meeting at UBS

On the evening of July 12, 2007, Ehrenberg and representatives of the buyer met in person and telephonically with Swedenburg, and McNeal and Cary Kochman, URI's lead investment banker at UBS, at the UBS offices in New York City. During this meeting, Swedenburg and Kochman enumerated a number of open deal issues, including the impasse over the interrelated Guarantee, Equity Commitment Letter,

---

**36.** Defs.' Ex. 12 at 4 (Draft Guarantee, July 1, 2007).

**37.** Defs.' Ex. 13 (Draft Merger Agreement, July 2, 2007).

**38.** *Id.*

**39.** *Id.* at 48, 62, 63 (of black-lined draft).

**40.** Defs.' Ex. 14 (Draft Merger Agreement, July 4, 2007).

**41.** *Id.* at 42, 64.

**42.** Ehrenberg Test. at 349.

**43.** *Id.*

and buyer's exposure in the event buyer did not close the transaction. Though the parties agree that reverse break-up fees were discussed, they dispute whether this issue was resolved at the meeting. According to defendants, Swedenburg and Kochman indicated that URI would accept payment of a reverse break-up fee as its sole and exclusive remedy in the event the buyer did not proceed with the transaction.[44] Plaintiff rejoins that Ehrenberg, who said he made notes of that meeting he has been unable to locate, now asserts that "URI's representatives told us that they were in agreement to the receipt of that fee being URI's sole and exclusive remedy in the event of breach of the merger agreement," but does not recall any actual words used or who said them.[45] Plaintiff further argues that, though Swedenburg acknowledged that the reverse break-up fee issues were discussed, there was certainty that no such "agreement" was reached and his notes of the July 12 meeting, which have been produced, do not reflect any such agreement.[46]

Following this July 12 meeting, Lowenstein revised Simpson's July 4 draft to reflect the understandings reached, including what Cerberus felt was an agreement that the buyer and all of its affiliates would have no obligation beyond payment of the reverse break-up fee in the event that they decided not to go forward with the merger transaction. On July 15, 2007, Lowenstein sent a full package of deal documents—including a revised draft of the Merger Agreement, a revised draft of the Guarantee, now identified as a "Limited Guarantee," and a draft of the Equity Commitment Letter—to Simpson and UBS.[47]

### g. The July 15, 2007 Draft of the Merger Agreement and the July 16, 2007 Conference Call

The July 15 draft of the Merger Agreement included, for the first time, the two key provisions that defendants say gave effect to the parties' agreement on July 12 that URI's sole and exclusive remedy against the buyer and all of its affiliates would, in all circumstances, be limited to payment of the reverse breakup fee. First, Lowenstein provided new language in the final sentence of section 8.2(e), which provided:

In no event, whether or not this Agreement has been terminated pursuant to any provision hereof, shall Parent, Merger Sub, Guarantor or the Related Parties, either individually or in the aggregate, be subject to any liability in excess of the Parent Termination Fee for any or all losses or damages relating to or arising out of this Agreement or the transactions contemplated by this Agreement, including breaches by Parent or Merger Sub of any representations, warranties, covenants or agreements contained in this Agreement, *and in no event shall the Company seek equitable relief* or seek to recover any money damages in excess of such amount from Parent, Merger Sub, Guarantor or any Related Party or any of their respective Representatives or Af-

**44.** Ehrenberg Test. at 352.

**45.** Ehrenberg Aff. ¶ 27; Ehrenberg Dep. 67–71.

**46.** Swedenburg Test., Trial Tr. vol. 1, 141–43, Dec. 18, 2007 [hereinafter "Swedenburg Test. at ——"]; Pl.'s Ex. 98 (Swedenburg July 12,

2007 notes). *See also* McNeal Test., Trial Tr. vol. 1, 86, Dec. 18, 2007 [hereinafter "McNeal Test. at ——"].

**47.** Defs.' Ex. 20 (Draft Merger Agreement, July 15, 2007; Draft Equity Commitment Letter and Guarantee, July 15, 2007).

filiates.[48]

Second, Lowenstein also added a sentence at the end of section 9.10 that expressly provided that section 8.2(e) subrogated section 9.10. Thus, the final sentence of section 9.10, as drafted by Lowenstein, provided as follows:

> The provisions of this Section 9.10 shall be subject in all respects to Section 8(e) [sic] hereof, which Section shall govern the rights and obligations of the parties hereto (and of the Guarantor, the Related Parties, and the Company Related Parties) under the circumstances provided therein.[49]

Consistent with the text of the form of Equity Commitment Letter it transmitted on July 15, which specified that URI was not a third-party beneficiary thereunder, Lowenstein also deleted from the July 15 drafts of the Merger Agreement and the Guarantee all of Simpson's language referring to URI's rights under, and ability to obtain specific enforcement of, the Equity Commitment Letter.[50] Because there had been no agreement regarding the amount of the reverse break-up fee, no figure was specified in the July 15 drafts of the Merger Agreement or the Limited Guarantee.

As noted, Lowenstein also supplied a draft of the Equity Commitment Letter on July 15, which made clear that URI would not be a third-party beneficiary:

> There is no express or implied intention to benefit any third party including, without limitation, the Company and nothing contained in this Equity Commitment Letter is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than Parent.[51]

This provision appears unchanged in the Equity Commitment Letter that ultimately was executed as part of the transaction.[52] Lowenstein's draft also provided that the party making the commitment would not be liable to any person, including the RAM Entities or URI, for costs or damages in the event that CCM breached the Equity Commitment Letter. The draft further provided that "any claims with respect to the transactions contemplated by the Merger Agreement or this Equity Commitment Letter shall be made only pursuant to the Guarantee to the extent applicable."[53] Again, these provisions were not disputed by URI and are included in the final version of the Equity Commitment Letter.

Following delivery of the July 15 Lowenstein drafts, lawyers from the two firms participated in a conference call to discuss what the parties perceived as "major issues" remaining to be resolved. During that call, defendants say Swedenburg again confirmed that URI was willing to agree that receipt of the break-up fee, from either the RAM Entities or the Guarantor, would be URI's "sole and exclusive" remedy if the buyer failed to close. Contemporaneous notes of the call taken by Lowenstein attorney Ethan Skerry reflect

---

48. *Id.* at 61, 62 of the black-lined draft (Draft Merger Agreement, July 15, 2007) (emphasis added).

49. *Id.* at 66, 67 of the black-lined draft (Draft Merger Agreement, July 15, 2007).

50. *Id.* at 66 of the black-lined draft (Draft Merger Agreement, July 15, 2007).

51. Defs.' Ex. 20 at 1 (Draft Equity Commitment Letter, July 15, 2007).

52. Defs.' Ex. 36 (Equity Commitment Letter, July 22, 2007).

53. Draft Equity Commitment Letter and Guarantee, July 15 at 1 of Equity Commitment Letter.

Swedenburg's purported confirmation.[54] Contemporaneous notes of the call taken by Ehrenberg do so as well.[55]

URI argues that the July 15, 2007 drafts of the Merger Agreement, Limited Guarantee, and Equity Commitment Letter proffered by RAM's lawyers provide the best evidence of what, if anything, the parties had agreed to on July 12, 2007. Late on the evening of July 15, 2007, Ehrenberg sent to Swedenburg drafts of the Merger Agreement, the Limited Guarantee, and the Equity Commitment Letter.[56] The July 15 draft made numerous revisions to Swedenburg's July 3 draft of the Merger Agreement.[57]

The words "sole and exclusive remedy" appear in the July 15 draft in only two parts of section 8.2(e).[58] In the first sentence, the "sole and exclusive remedy" language (which was already in an earlier draft circulated by URI) applies only to "all loss or damage ... upon *any termination* in accordance with clause (i) or (ii) of this section 8.2(e)." [59] And the second sentence—newly added by Ehrenberg in response to the July 12 meeting [60]—makes clear that "[t]he parties acknowledge and agree that the Parent Termination Fee ... constitute liquidated damages and are not a penalty and shall be the *sole and exclusive remedy* for recovery by the Company ... in the *event of termination of this Agreement by [URI]* in compliance with the provisions of Section 8.1(d)(i) or (ii) ..." [61]

As demonstrated by Ehrenberg's redline of section 9.10, he made one change—to delete URI's right to itself obtain specific performance of the Equity Commitment Letter—but he left untouched URI's express specific performance rights to compel RAM to make reasonable best efforts to obtain the Financing, and consummate the Merger if the Financing was available but was not drawn down by RAM. Most important, despite having stricken section 9.10(b) in previous drafts, he chose not to delete section 9.10(b) on July 15 but rather to edit it by deleting the words "the Equity Commitment Letter" and the "pay the Equity Financing" from section 9.10(b).[62] He then added the last sentence, which he claims rendered section 9.10(b), with its detailed provisions of specific performance, a nullity.[63] But Ehrenberg could provide no real explanation why he did not delete, but rather edited, section 9.10(b).[64] Ehrenberg conceded that it might have been clearer to just delete it.[65]

On July 16, Ehrenberg (and his colleagues) and Swedenburg discussed Eh-

**54.** Defs.' Ex. 23 (Notes, July 16, 2007).

**55.** Defs.' Ex. 22 (Notes, July 16, 2007).

**56.** Swedenburg Dep. 124, 129.

**57.** Ehrenberg Dep. 73–75; Ehrenberg Aff. Ex. H2.

**58.** Ehrenberg Aff. Ex. H2 at 61–62.

**59.** Defs.' Ex. 20 (Draft Merger Agreement, July 15, 2007) (emphasis added).

**60.** Ehrenberg Dep. 72–77.

**61.** Defs.' Ex. 20 (Draft Merger Agreement, July 15, 2007) (emphasis added).

**62.** Ehrenberg Dep. 59–64.

**63.** Ehrenberg Dep. 229–33.

**64.** Ehrenberg Dep. 60–64. On July 15, 2007, Ehrenberg also provided his comments to the Limited Guarantee. There, unlike his revision to section 9.10 of the Merger Agreement (in which URI's right to seek specific performance was preserved), he deleted the provision investing URI with a direct right to seek specific performance of the Equity Commitment Letter. (Ehrenberg Aff. ¶¶ 33–34 and Ex. I; Ehrenberg Dep. 60–61).

**65.** Ehrenberg Test. at 391–92.

renberg's July 15 draft.[66] Swedenburg testified that he was generally agreeable with the draft "as written." [67]

### h. The July 18, 2007 Draft of the Merger Agreement

On July 18, 2007, Simpson circulated a responsive draft of the Merger Agreement, marked to show changes from the Lowenstein July 15 draft.[68] Simpson deleted the phrase "equitable relief" from the final sentence of Section 8.2(e).[69] Simpson did not propose to restore in either the Merger Agreement or the Limited Guarantee, or to add to the Equity Commitment Letter, any reference to a specific performance right with respect to the equity financing.[70]

### i. The July 19, 2007 Meeting

On July 19, 2007, representatives of the parties and their advisors met at Lowenstein's New York offices. Those in attendance included McNeal of UBS, Ehrenberg, Shapiro, and Skerry of Lowenstein, and Holt, a Cerberus in-house attorney. Steven Mayer, RAM's President and Chief Executive Officer on behalf of the buyer, and Swedenburg, of Simpson, participated by telephone. Lowenstein had circulated to URI's representatives in advance of the meeting an agenda based upon Simpson's July 18 draft, listing what it saw as open issues.[71] The agenda included, in perti-

nent part, items about "fee issues" (company termination; reverse termination; go shop; other fees payable at the time of termination) and "limitation of liability in 8.2(e)." [72]

A principal point of discussion at the meeting concerned the size of the break-up fee that the buyer would have to pay if it chose not to proceed with the merger. Swedenburg explained that URI would require a reverse break-up fee of sufficient size to ensure that it would be "scary" and "painful" for the RAM Entities to walk away from the transaction.[73] Swedenburg noted that URI was not content merely to rely upon the reputational fallout that would ensue if the RAM entities and their affiliates failed to close. Swedenburg's remarks are reflected in notes taken contemporaneously at the meeting by Holt.[74]

Testimony from McNeal, one of URI's bankers at UBS, confirms that the parties discussed that URI wanted a large break-up fee in light of the buyer's ability to walk away from the deal, and that URI was counting on the combination of that fee and the buyer's concerns about its reputation as a basis for believing that the buyer would not elect to walk away from the transaction.[75] McNeal recalled that UBS representatives stated, "We want a high break-up fee so you'll feel a lot of pain if

---

**66.** Ehrenberg Dep. 88–92; Swedenburg Dep. 120–21.

**67.** Swedenburg Dep. 123–26 ("I intended to convey that we were okay with those sections as written in the draft subject to wordsmithing ... [w]hen it comes to the reverse break-up fee construct the way that 9.10 was written and generally the way that 8.2(e) was written, although like I said, both of them I said subject to some wordsmithing.").

**68.** Draft Merger Agreement, July 18.

**69.** Defs.' Ex. 24 at 66 of the black-lined draft (Draft Merger Agreement, July 18, 2007).

**70.** *Id.* at 70 of the black-lined draft.

**71.** Defs.' Ex. 28 (Agenda, July 19, 2007).

**72.** *Id.*

**73.** Holt Test., Trial Tr. vol. 2, 542, Dec. 19, 2007 [hereinafter "Holt Test. at ——"].

**74.** Defs.' Ex. 30 at 1 (Notes, July 19, 2007).

**75.** McNeal Test. at 112–113.

you walk from this deal."[76] Similarly, McNeal testified that there was also a discussion of reputational damage to the purchaser if it walked away from this transaction in breach of the merger agreement.[77]

As reflected in Holt's notes, the parties then proceeded to debate the appropriate amount of the break-up fee, including a discussion of what would be a "market" fee, with the buyer offering $75 million (up from $50 million it had contemplated earlier), and URI demanding $110 million. There was also a discussion of expenses payable in the event either side chose not to complete the merger. Holt's notes captured the discussion as follows: "If CCM stepping away, willing to pay expenses plus break-up fee at $75 MM."[78]

Later during the night of July 19, attorneys from Lowenstein had a number of calls with Swedenburg to review specific language in the July 18 Simpson draft of the Merger Agreement, in an effort to come to agreement on text to reflect the various agreements reached during the broader discussion that had preceded. During a discussion of Simpson's changes to section 8.2(e)—specifically, their removal of the phrase "equitable relief"—Lowenstein attorney Skerry recalls that it was reiterated to Swedenburg that the documents must reflect the agreement that URI's only remedy in the event the buyer did not proceed would be payment of the so called Parent Termination Fee. In that context, the Lowenstein attorneys explained that the bar on "equitable relief" had to be put back into section 8.2(e), and

Swedenburg stated in response, "I get it."[79]

### j. The July 20, 2007 Draft of the Merger Agreement

Lowenstein then circulated a revised draft of the Merger Agreement on July 20, 2007. Among other things, that revised draft reinserted the language in section 8.2(e) barring URI from seeking "equitable relief."[80] The final sentence of section 8.2(e) thus read exactly as it does in the final Merger Agreement, and contains the admonition that "in no event shall the Company seek equitable relief or seek to recover any money damages in excess of such amount from Parent, Merger Sub, Guarantor or any Related Party or any of their respective Representatives or Affiliates."[81]

### k. The July 21, 2007 Conversation

On July 21, 2007, in a conversation between Mayer, Kochman, and McNeal, Mayer indicated that he thought RAM was purchasing an "option," Kochman strongly disagreed with the contention. Kochman testified about that conversation:

A. He said, you know, "Gee, that's a lot of money. You know, I view this as an option. And my LPs would be very unhappy if I, you know, burnt that 100 million plus dollars." And I was taken aback by that.

Q. And what did you say to him?

A. I said, "You know, that's crazy. That's a nonstarter. This is not an option. That's something I would never

---

76. *Id.* at 113.

77. *Id.* at 114.

78. Defs.' Ex. 38 at 1 (Notes, July 19, 2007).

79. Skerry Test., Trial Tr. vol. 2, 497, Dec. 19, 2007 [hereinafter "Skerry Test. at ——"].

80. Defs.' Ex. 31 (Draft Merger Agreement, July 20, 2007).

81. *Id.* at 58 of black-lined draft.

take back to the board." And I laid into him fairly good and said that this is a board that has concerns about your ability to consummate transactions. They see what's going on with Chrysler. They don't view you in the same breaths as KKR or Blackstone. And, you know, it's a complete nonstarter.

Q. Did he respond to that?

A. He backed away. He said, "Time out. You know, I'm 100 percent committed to this transaction. I'm going to take you—I'm going to tell you right now that the debt financing and the commitment letters we have in hand are designed exactly for difficult markets. We'll get this deal done. I'm going to take you under the tent." [82]

### 4. *RAM's Repudiation and Breach of the Merger Agreement*

On November 14, 2007, RAM Holdings notified URI that it would not proceed with the acquisition of URI on the terms stated in the Merger Agreement, but would be prepared to enter into discussions with URI about revised terms. RAM repudiated via letter, which stated, in part:

> ... this is to advise that Parent and Merger Sub [RAM] are not prepared to proceed with the acquisition of URI on the terms contemplated by the Agreement.
>
> Given this position and the rights and obligations of the parties under the Agreement and the ancillary documentation, we see two paths forward. If URI is interested in exploring a transaction between our companies on revised terms, we would be happy to engage in a constructive dialogue with you and representatives of your choosing at your

earliest convenience. We could be available to meet in person or telephonically with URI and its representatives for this purpose immediately. In order to pursue this path, we would need to reach resolution on revised terms within a matter of days.

> If, however, you are not interested in pursuing such discussions, we are prepared to make arrangements, subject to appropriate documentation, for the payment of the $100 million Parent Termination Fee.
>
> We look forward to your response.[83]

Citing sources "close to the deal," several news stories beginning around 9:30 a.m. and published throughout the day on November 14, 2007 indicated that RAM was not intending to consummate the merger in accordance with the terms of the Merger Agreement. URI's shares fell by more than 30% to $23.50 per share, $10.29 less than the opening price. URI's stock was the NYSE's largest decliner of the day.

URI argues that it is plain that RAM's actions are directed at putting pressure on the board of directors of URI to renegotiate a price below $34.50 per share. Indeed, on the evening of November 14, the same day that RAM sent its letter, a senior executive of RAM initiated contact with URI's investment banker, UBS, to offer a substantially reduced price. URI promptly rejected this "offer" and, on November 19, 2007, filed the present lawsuit seeking specific performance of the Merger Agreement.

## II. RAM'S STANDING ARGUMENT

■ RAM has, both in its briefing and at trial, suggested that this case should be dismissed because URI lacks standing to

---

**82.** Kochman Test. at 303–305. *See also* McNeal Test. at 94–96.

**83.** Pl.'s Ex. 169 (Nov. 14, 2007 letter).

assert its claims. Viewing this action as a mere pretense, RAM argues that URI, in reality, is attempting to compel performance by CCM of the Equity Commitment Letter. Specifically, RAM contends that URI cannot do this because (1) URI is not an intended third party beneficiary of the Equity Commitment Letter, and (2) URI agreed to refrain from bringing this action in the Limited Guarantee. Neither argument is successful.

### A. That URI Is Not a Third Party Beneficiary Under the Equity Commitment Letter Is Irrelevant

■ The Equity Commitment Letter explicitly disclaims that it confers rights on any third parties. Indeed, under New York and Delaware law, persons who are neither parties nor intended third party beneficiaries of a contract may not sue to enforce the contract's terms.[84] Accordingly, URI probably lacks the ability to sue CCM under the Equity Commitment Letter. As is quite clear from the caption of this case, however, URI here brings an action against the RAM Entities; CCM is not a party. URI is unquestionably a party to the Merger Agreement, and it is the Merger Agreement that URI seeks to enforce in this action.

### B. The Limited Guarantee Does Not Bar an Action Against RAM by URI

Defendants also rely on the Limited Guarantee to support their contention that URI may not bring this suit. In para-

graph 4(a), URI agrees "that it has no right of recovery in respect of a claim arising under the Merger Agreement ... against any former, current, or future officer, agent, affiliate, or employee of [Cerberus Partners or RAM]...."[85] That subparagraph further states that URI agrees it will not bring any such action "by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of [RAM] against [Cerberus Partners], except for its rights under this Limited Guarantee...."[86] Subparagraph (b) proclaims that

> Recourse against [Cerberus Partners] under this limited guarantee shall be the sole and exclusive remedy of the Company and all of its affiliates against [Cerberus Partners and RAM] in respect of any liabilities or obligations arising under, or in connection with, the Merger Agreement ... including in the event [RAM] breaches any covenant, representation or warranty under the Merger Agreement or [Cerberus Partners] breaches a covenant, representation or warranty hereunder.[87]

■ RAM suggests that URI is attempting to "pierce the corporate veil" or make a claim by or on behalf of RAM against Cerberus Partners in contravention of paragraph 4(a). The "corporate veil" is a legal term of art that stands for the proposition "that the acts of a corporation are not the actions of its shareholders, so that the shareholders are exempt from

---

**84.** *NAMA Holdings, LLC v. Related World Market Center, LLC,* 922 A.2d 417, 434 (Del. Ch.2007) ("As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions."); *Nepco Forged Prods., Inc. v. Consol. Edison Co. of N.Y., Inc.,* 99 A.D.2d 508, 470 N.Y.S.2d 680, 681 (1984) ("Where a provision exists in an agreement expressly negating an

intent to permit enforcement by third parties, as exists in the agreement at bar, that provision is decisive.").

**85.** Limited Guarantee ¶ 4(a).

**86.** *Id.*

**87.** *Id.* at ¶ 4(b).

liability for the corporation's actions."[88] To "pierce" the corporate veil is to disregard that legal assumption and to go directly after a corporation's shareholders rather than the corporation itself.[89] URI is doing no such thing in this case. On the contrary, it steadfastly clings to the legal fact that the RAM Entities are independent, legal "persons." URI has brought this case against them—not against Cerberus Partners—and the RAM Entities are explicitly carved out in the Limited Guarantee.[90] Additionally, URI is clearly not bringing a claim "by or on behalf" of RAM; it is bringing a claim *against* RAM.

Finally, RAM's reliance on the "sole and exclusive remedy" language of paragraph 4(b) is untenable. RAM's reading of that paragraph omits a key sentence: "Nothing set forth in this Limited Guarantee shall affect or be construed to affect any liability of Parent or Merger Sub to the Company . . . ." The Limited Guarantee—by its own explicit terms—does not affect the liability of RAM to URI; the Limited Guarantee cannot, then, be read to preclude this action.

RAM's fundamental point is not lost on this Court: the evidence of these agreements and their negotiation does indeed suggest that RAM/Cerberus Partners worked mightily to limit drastically URI's ability to seek recourse against Cerberus Partners. Those same agreements, however, repeatedly carve out exceptions that preserve URI's ability to seek recourse against RAM. When something goes wrong in these sorts of transactions, lawsuits are sure to follow.[91] Cerberus Partners availed itself of the protections of the corporate veil by creating the RAM Entities. The mere creation of a new corporate form does not, however, eviscerate liability, it merely shifts it. Though URI may harbor dreams of compelling performance by Cerberus Partners and CCM, that is not what they seek in this action, and the agreements at issue in this case in no way prevent URI from suing RAM directly for its admitted breach.

### III. SUMMARY JUDGMENT

#### A. *Legal Standards*

■■■ A trial is merely a vehicle for the act of fact finding. To the extent this Court needs to resolve a legal question alone, no trial is necessary.[92] Summary judgment under Rule 56 allows resolution of a legal issue without the "delay and expense of a trial."[93] Summary judgment

---

**88.** BLACK'S LAW DICTIONARY 365 (8th ed.2004).

**89.** *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, C.A. Nos. 762–N, 763–N, 2005 WL 2130607, at *9–10 (Del.Ch. Aug. 26, 2005).

**90.** *See* Limited Guarantee at ¶ 4(a) ("the term Guarantor/Parent Affiliates shall not include the Guarantor, Parent or Merger Sub").

**91.** *Cf.* Robert B. Thompson & Randall S. Thomas, *The New Look of Shareholder Litigation: Acquisition–Oriented Class Actions*, 57 VAND. L.REV. 133 (2004) (discussing the significant rise of acquisition-oriented class action lawsuits).

**92.** Fact finding leads to the best reconstruction of the parties' intentions while drafting the contract, and the purpose of contract interpretation is to discover the common intent of the parties. Nevertheless, the fact finding process is fulsome and costly. Courts can and should interpret unambiguous contracts without recourse to extrinsic evidence when possible in order to provide for the efficient resolution of disputes. *See* Richard A. Posner, *The Law and Economics of Contract Interpretation*, 83 TEX. L.REV. 1581, 1590, 1592 (2005).

**93.** *In re Maull*, C.A. No. 1533, 1994 WL 374302, at *2 (Del.Ch. June 9, 1994) ("The purpose of summary judgment is to avoid the delay and expense of a trial where there is nothing for the fact finder to decide."); *N & W Dev. Co. v. Carey*, C.A. No. 6885, 1983 WL 17997, at *3 (Del.Ch. Jan. 27, 1983) ("The purpose of summary judgment is the avoid-

is only granted, however, when the movant can demonstrate that there are no genuine issues of material fact.[94] Indeed, the burden is on the movant, and the Court reviews all of the evidence in the light most favorable to the non-moving party.[95]

When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous. Therefore, the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous.[96] Ambiguity does not exist simply because the parties disagree about what the contract means.[97] Moreover, extrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning.[98] Rather, contracts are ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." [99] Stated differently, to suc-

ceed on its motion for summary judgment, URI must establish that its construction of the merger agreement is the *only* reasonable interpretation.[100] Guided by "Delaware's well-understood principles of contract interpretation," [101] this Court concludes that URI has not succeeded in establishing that its interpretation of the disputed provisions is the only reasonable one. Because the Court concludes that the provisions are fairly susceptible to at least two reasonable interpretations, the contract is ambiguous and summary judgment is inappropriate.

### B. URI's Interpretation of the Merger Agreement is Reasonable

URI argues that the plain and unambiguous language of the merger agreement allows for specific performance as a remedy for the Ram Entities' breach. Section 9.10 expressly invests URI with a right to seek specific performance to enforce the Merger Agreement and to obtain an order

---

ance of a useless trial where there is no genuine issue as to any material fact."), *aff'd,* 474 A.2d 138 (Del.1983).

**94.** Ct. Ch. R. 56(c).

**95.** *HIFN, Inc. v. Intel Corp.,* C.A. No. 1835–VCS, 2007 WL 1309376, at *9 (Del.Ch. May 2, 2007).

**96.** *Nw. Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (Del.1996); *see also* Lawrence M. Solan, *Pernicious Ambiguity in Contracts and Statutes,* 79 Chi.-Kent L.Rev. 859, 862 (2004) ("Thus, a court acts like a gatekeeper in making its initial inquiry into whether an ambiguity exists."); Gregg L. Weiner, *But is it Clear? Avoiding Ambiguous Contracts,* 10 Bus. L. Today 33, 34–35 (2001).

**97.** *Esmark,* 672 A.2d at 43; *Seidensticker v. Gasparilla Inn, Inc.,* C.A. No. 2555–CC, 2007 WL 4054473, at *2 (Del.Ch. Nov. 8, 2007); *accord John v. United States,* 247 F.3d 1032, 1041 (9th Cir.2001) ("[S]tatutory ambiguity cannot be determined by referring to the parties' interpretations of the statute. Of course

their interpretations differ. That is why they are in court.").

**98.** *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *Seidensticker,* 2007 WL 4054473, at *2–3; *Lions Gate Entm't Corp. v. Image Entm't Inc.,* C.A. No.2011–N, 2006 WL 1668051, at *6 (Del.Ch. June 5, 2006).

**99.** *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992).

**100.** *See Modern Telecomms., Inc. v. Modern Talking Picture Serv.,* C.A. No. 8688, 1987 WL 11286, at *3 (Del.Ch. May 27, 1987).

**101.** *HIFN, Inc. v. Intel Corp.,* C.A. No. 1835–VCS, 2007 WL 1309376, at *9 (Del.Ch. May 2, 2007).

enjoining RAM to (i) make reasonable best efforts to obtain financing and satisfy the Merger Agreement's closing conditions, and (ii) consummate the transactions when financing is available and has not been drawn down by RAM as a result of its breach of the Merger Agreement.

Section 9.10, however, explicitly states that it is "subject in all respects to Section 8.2(e) hereof, which Section shall govern the rights and obligations of the parties ... under the circumstances provided therein." Section 8.2(e) describes the $100 million Parent Termination Fee payable to URI as the "sole and exclusive" remedy against RAM under the Agreement when there has been a termination of the Merger Agreement by URI. Further, section 8.2(e) provides that

> In no event, whether or not this Agreement has been terminated pursuant to any provision hereof, shall [RAM or Cerberus Partners] ... be subject to any liability in excess of the Parent Termination Fee for any or all losses or damages relating to or arising out of this Agreement or the transactions contemplated by this Agreement, ... and in no event shall the Company seek equitable relief or seek to recover any money damages in excess of such amount from [RAM or Cerberus Partners]....

Relying heavily on the canon of construction that requires harmonization of seemingly conflicting contract provisions,[102] URI contends that specific performance under section 9.10 remains a viable remedy despite the language of section 8.2(e). URI offers two chief reasons in support of this position. First, section 8.2(e)'s $100 million Parent Termination Fee operates as the "sole and exclusive" remedy only if one of the parties terminates the agreement. Termination is a defined term in the Agreement, however, and it is not equivalent to a breach. URI contends (and RAM does not dispute) that neither party has terminated the agreement pursuant to section 8. Thus, the Termination Fee is not necessarily the "sole and exclusive remedy" in this case. Second, URI submits that the outright prohibition of equitable remedies in the last sentence of section 8.2(e) is limited to equitable remedies that involve monetary compensation like restitution or rescission. The sentence commands that "in no event shall [URI] seek equitable relief or seek to recover any money damages in excess of [the $100 million Termination Fee] from [RAM or Cerberus]." URI argues that the prepositional phrase ("in excess of the" termination fee) modifies *both* "equitable relief" and "money damages." This reading is required, URI says, because otherwise this sentence would render section 9.10 "mere surplusage"[103] devoid of any meaning in violation of longstanding principles of contractual interpretation. Moreover, URI points to the final sentence of section 8.2(a) as proof that the Agreement contemplates a right to specific performance: "The parties acknowledge and agree

---

102. *See, e.g., Counsel of the Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole."); *Delta & Pine Land Co. v. Monsanto Co.*, C.A. No. 1970–N, 2006 WL 1510417, at *4 (Del.Ch. May 24, 2006) ("It is, of course, a familiar principle that contracts must be interpreted in a manner that does not render any provision 'illusory or meaningless.' ").

103. *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC*, C.A. No. 2742–VCN, 2007 WL 3317551, at *11 (Del.Ch. Nov. 2, 2007) ("Delaware courts do prefer to interpret contracts to give effect to each term rather than to construe them in a way that renders some terms repetitive or mere surplusage.").

that, subject to Section 8.2(e), nothing in this Section 8.2 shall be deemed to affect their right to specific performance under Section 9.10." According to URI, section 8.2(a) shows that the parties were aware of the "specific performance" remedy and could have expressly eliminated it. The Merger Agreement does not do so; instead, it explicitly provides that both specific performance and injunctive relief are available remedies.

The RAM Entities counter that URI's interpretation is unreasonable. First, they argue, it is URI's position that would render portions of the Agreement "mere surplusage." If the operation of section 8.2(e) were in fact limited, as URI asserts, to circumstances in which the Merger Agreement had been properly terminated by either party, there would be no need to include a sentence in section 9.10 subjecting the specific performance provisions of section 9.10 to section 8.2(e) because specific performance, by law, would be unavailable in those circumstances; one cannot specifically perform an agreement that has been terminated. Thus, section 8.2(e) must have applicability outside the context of termination. Second, the RAM Entities argue that is unreasonable to limit the phrase "equitable relief" to those equitable remedies that include monetary damages.

Reading the Agreement as a whole and with the aid of the fundamental canons of contract construction, I conclude that URI's interpretation is reasonable. The parties explicitly agreed in section 9.10 that "irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached." They further agreed that "the Company shall be entitled to see an injunction or injunctions ... to enforce compliance." Given this clarion language supporting the existence and availability of specific performance, it is reasonable to read the limitations of section 8.2(e) in the manner URI has championed. RAM's arguments to the contrary are ultimately unpersuasive. Neither party has terminated the Agreement pursuant to the termination provisions of section 8.1, and the context of the final sentence of section 8.2(e) allows one to reasonably conclude that "equitable relief" in that sentence means only equitable relief involving monetary damages. URI's interpretation thus represents a reasonable harmonization of apparently conflicting provisions.

### C. RAM's Interpretation of the Merger Agreement Also Is Reasonable

Though defendants fail to demonstrate that plaintiff's interpretation of the Merger Agreement is unreasonable as a matter of law, defendants do succeed in offering a reasonable alternative interpretation.[104] In opposing URI's motion for summary judgment, defendants deny that the provisions of the Merger Agreement conflict so as to require harmonization. The relationship between sections 9.10 and 8.2(e), as set forth in section 9.10 is, defendants contend, clear: section 9.10 is "subject to"

104. If defendants had filed a cross-motion for summary judgment and, therefore, borne the burden to demonstrate that their interpretation was, in fact, the *only* reasonable interpretation as a matter of law, this Court would not have hesitated to deny defendants' motion. Here, however, in opposing plaintiff's motion, defendants need only to meet the lesser burden of demonstrating that their interpretation was *a* reasonable interpretation and that, therefore, plaintiff's interpretation of the Merger Agreement is not the sole reasonable interpretation. I find that defendants have satisfied this burden, concluding that their proffered interpretation is not unreasonable as a matter of law and that, therefore, the agreement is ambiguous. This was, however, as I indicated in my letter opinion denying plaintiff's motion, an exceedingly close question.

section 8.2(e).[105] Section 8.2(e) then provides that "in no event shall [URI] seek equitable relief or seek to recover any money damages in excess of such amount [*i.e.*, the $100 million termination fee] from [RAM or Cerberus]." RAM argues that section 8.2(e) operates to prohibit URI from seeking any form of equitable relief (including specific performance) under all circumstances, relegating URI's relief to only the $100 million termination fee. Relying on *Penn Mutual Life Insurance Co. v. Oglesby*[106] and *Supermex Trading Co., Ltd. v. Strategic Solutions Group, Inc.,*[107] defendants contend that Delaware law specifically permits the parties to establish supremacy and subservience between provisions such that, where the terms of one provision are expressly stated to be "subject to" the terms of a second provision, the terms of the second provision will control, even if the terms of the second provision conflict with or nullify the first provision. Additionally, RAM argues, unlike plaintiff's interpretation, RAM's interpretation utilizes only the plain meaning of "equitable relief." As described above, plaintiff, in proposing a reconciliation of the section 8.2(e) limitation on equitable relief with the right of specific performance in section 9.10, urges this Court to read the words "equitable relief" and "money damages" as modified by the phrase "in excess of" the termination fee. Defendants' interpretation of this portion of the provision is, however, at least as reasonable as (if not more than) that of plaintiff. The phrase "in excess of" appears, grammatically, to modify only "money damages." [108]

Plaintiff argues that if RAM had wanted to eliminate URI's rights to specific performance in all circumstances, it could have simply stricken out clause (b) of section 9.10. Though the Court has no doubt that this simple (and seemingly obvious) drafting approach would have been superior, on a motion for summary judgment, I cannot look beyond the text of the agreement to inquire into the motivations of the parties or to consider ways in which a particular end may have been more efficiently achieved and more clearly articulated. An interpretation of the Agreement that relies on the parties' addition of hierarchical phrases, instead of the deletion of particular language altogether, is not unreasonable as a matter of law.

Having considered all of plaintiff's arguments, I must conclude that plaintiff has not shown that defendants' interpretation is unreasonable as a matter of law. The contracting parties here chose terms, such as "subject to," that impose a hierarchy among provisions. Defendants' interpretation of those terms and the provisions they affect is not, I conclude, unreasonable.

---

105. The relevant portion of section 9.10 provides: "The provisions of this Section 9.10 shall be subject in all respects to Section 8.2(e) hereof, which Section shall govern the rights and obligations of the parties hereto (and of the Guarantor, the Parent Related Entities, and the Company Related Parties) under the circumstances provided herein." Merger Agreement § 9.10.

106. 695 A.2d 1146, 1150 (Del.1997) (finding that the phrase "subject to all provisions" operated to "sublimate or 'trump'" other provisions).

107. No. 16183, 1998 WL 229530 (Del.Ch. May 1, 1998).

108. The relevant portion of 9.10 provides: "and in no event shall the Company seek equitable relief or seek to recover any money damages in excess of such amount...." The natural reading of this clause, given the usage of the verb "seek" with both "equitable relief" and "monetary damages" seems to be the reading suggested by RAM.

D. *Because Both Interpretations of the Merger Agreement are Reasonable, the Agreement is Ambiguous and Summary Judgment Is Inappropriate*

It is probably unlikely that a single, *unambiguous* agreement can simultaneously affirm and deny the availability of a specific performance remedy. If there is such an unambiguous contract, it is certainly not the contract at issue in this case. Both URI and RAM have proffered reasonable readings of the Merger Agreement, and because "provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity." [109] Thus, plaintiff's and defendants' arguments suffer the same flaw, which is fatal at this stage: each party is unable to demonstrate that its proposed interpretation of the Merger Agreement is the *only* interpretation of the Agreement that is reasonable as a matter of law. In such a case, summary judgment is inappropriate because the court is presented with a genuine issue of material fact: what was the intent of the parties? [110] Therefore, I must consider extrinsic evidence to ascertain *the* meaning of the Merger Agreement.

## IV. TRIAL

The Court heard testimony from seven witnesses over a two-day trial in order to resolve the factual issue of what was the common understanding of the parties with respect to remedies in the Merger Agreement. The Merger Agreement, of course, is a contract, and the Court's goal when interpreting a contract "is to ascertain the shared intention of the parties." [111] Thus, URI, which seeks to specifically enforce the Merger Agreement, bore the burden of persuasion in demonstrating that the common understanding of the parties was that this contract allowed for the remedy of specific performance and that URI is entitled to such a remedy. [112] URI has failed to meet its burden.

### A. Legal Standards

Having determined that the contract is ambiguous on account of its conflicting provisions, the Court permitted the parties to introduce extrinsic evidence of the negotiation process. [113] Such extrin-

---

109. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997).

110. *Cf. BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.,* C.A. No. 20456, 2004 WL 1739522 (Del.Ch. Aug. 3, 2004) (denying a motion for judgment on the pleadings because "[t]he parties have set forth 'more than one plausible construction of' the meaning of" a key term in the contract).

111. *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC,* 2007 WL 3317551, at *9.

112. The burden of persuasion with respect to the existence of the contractual right is a "preponderance of the evidence" standard. *Carlson v. Hallinan,* 925 A.2d 506, 524 (Del. Ch.2006); *Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.,* C.A. No. 14348, 1995 WL 707916, at *6 (Del.Ch. Nov. 28, 1995) ("[I]t becomes incumbent upon the party seeking judicial enforcement of their [sic] interpretation of the ambiguous language to show by a preponderance of the evidence that the other party knew or had reason to know of the meaning they [sic] attached to the language."). The burden of persuasion with respect to the entitlement to specific performance is by a "clear and convincing evidence" standard. *In re IBP, Inc., S'holders Litig.,* 789 A.2d 14, 52 (Del.Ch.2001).

113. *E.g., Pellaton v. Bank of N.Y.,* 592 A.2d 473, 478 (Del.1991); *Nw. Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (Del.1996); *Brandywine River Props., LLC v. Maffett,* C.A. No. 2655–VCN, 2007 WL 4327780, at *3–4 (Del.Ch. Dec. 5, 2007) (considering extrinsic evidence to ascertain the parties' common understanding of an ambiguous contract term); *see also* Eric. A. Posner, *The Parol Evidence Rule, the Plain Meaning Rule, and*

sic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry." [114] This evidence may lead to "a single 'correct' or single 'objectively reasonable' meaning." [115] Restated, the extrinsic evidence may render an ambiguous contract clear so that an "objectively reasonable party in the position of either bargainer would have understood the nature of the contractual rights and duties to be." [116] In such a case, the Court would enforce the objectively reasonable interpretation that emerges.

The Court must emphasize here that the introduction of extrinsic, parol evidence does not alter or deviate from Delaware's adherence to the objective theory of contracts. [117] As I recently explained to counsel in this case, the private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, [118] because the meaning of a properly formed contract must be shared or common. [119] That is not to say, however, that a party's subjective understanding is never instructive. On the contrary, in cases where an examination of the extrinsic evidence does not lead to an obvious, objectively reasonable conclusion, the Court may apply the forthright negotiator principle. [120] Under this principle, the Court considers the evidence of what one party *subjectively* "believed the obligation to be, coupled with evidence that the other party knew or should have known of such belief." [121] In

the Principles of Contractual Interpretation, 146 U. PA. L.REV. 533, 535 (1998) ("A court will refuse to use evidence of the parties' prior negotiations in order to interpret a written contract unless the writing is (1) incomplete, (2) ambiguous, or (3) the product of fraud, mistake, or a similar bargaining defect.").

114. *Supermex Trading Co. v. Strategic Solutions Group Inc.*, C.A. No. 16183, 1998 WL 229530, at *3 (Del.Ch. May 1, 1998); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del.1997) ("In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.").

115. *U.S. West, Inc. v. Time Warner, Inc.*, C.A. No. 14555, 1996 WL 307445, at *10 (Del.Ch. June 6, 1996).

116. *Id.*

117. *See Seidensticker v. Gasparilla Inn, Inc.*, C.A. No. 2555–CC, 2007 WL 4054473, at *1 (Del.Ch. Nov. 8, 2007) (recognizing Delaware's objective theory of contracts).

118. *See United Rentals, Inc. v. RAM Holdings, Inc.*, C.A. No. 3306–CC, letter decision at 2 (Del.Ch. Dec. 17, 2007) ("Evidence of one

side's undisclosed, private mental impressions or understandings is useless."); *see also Bell Atl. Meridian Sys. v. Octel*, 1995 WL 707916, at *5 n. 4 ("[I]t is generally not the parties' unexpressed intent or understanding that is relevant.").

119. *See* RESTATEMENT (SECOND) OF CONTRACTS § 201 cmt. c (1981). Indeed, this is precisely why constructs like the parol evidence rule and the statute of frauds exist: "the fear that the more we allow the words of a contract to be challenged in the name of the parties' actual intent, the more we produce disorder or even chaos, waiting to be exploited by unscrupulous litigants who demand a bonus to do what they already promised to do." Peter Linzer, *The Comfort of Certainty: Plain Meaning and the Parol Evidence Rule*, 71 FORDHAM L.REV. 799, 804 (2002).

120. *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del.Ch.2003).

121. *U.S. West, Inc. v. Time Warner, Inc.*, C.A. No. 14555, 1996 WL 307445, at *11 (Del.Ch. June 6, 1996); *see also id.* at *10 ("Only an objectively reasonable interpretation that is in fact held by one side of the negotiation and which the other side *knew or had reason to know that the first party held* can be enforced as a contractual duty."); *accord Alland v. Consumers Credit Corp.*, 476 F.2d 951, 956 (2d Cir.1973).

other words, the forthright negotiator principle provides that, in cases where the extrinsic evidence does not lead to a single, commonly held understanding of a contract's meaning, a court may consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party.[122] It is with these fundamental legal principles in mind that I consider the factual record developed at trial.

### B. Analysis

The evidence presented at trial conveyed a deeply flawed negotiation in which both sides failed to clearly and consistently communicate their client's positions. First, I find that the extrinsic evidence is not clear enough to conclude that there is a single, shared understanding with respect to the availability of specific performance under the Merger Agreement. Second, I employ the forthright negotiator principle to make two additional findings. With respect to URI, I find that even if the Company believed the Agreement preserved a right to specific performance, its attorney Eric Swedenburg categorically failed to communicate that understanding to the defendants during the latter part of the negotiations. Finally, with respect to RAM, although it could have easily avoided this entire dispute by striking section 9.10(b) from the Agreement, I find that its attorney did communicate to URI his understanding that the Agreement precluded any specific performance rights. Consequently, I conclude that URI has failed to meet its burden and determine that the Merger Agreement does not allow a specific performance remedy.

1. *The Extrinsic Evidence Presented at Trial Does Not Lead to an Obvious, Reasonable Interpretation of This Hopelessly Conflicted Contract*

■ As discussed above, this Merger Agreement simultaneously purports to provide and preclude the remedy of specific performance.[123] Despite the plaintiff's well-argued motion for summary judgment, the conflicting provisions of this contract render it decidedly ambiguous. At trial, both sides attempted to show that the extrinsic evidence led ineluctably to that party's respective interpretation. This was an exercise in futility.

The parties began their negotiations very far apart. URI circulated a draft that included numerous provisions favorable to their side, including several mechanisms by which URI could specifically enforce the merger against Cerberus.[124] RAM responded with a "heavy-handed" mark-up.[125] Early conversations led to no agreement, and URI simply ignored many

---

122. *See Supermex Trading Co. v. Strategic Solutions Group, Inc.*, C.A. No. 16183, 1998 WL 229530, at *3 (Del.Ch. May 1, 1998) ("It is the law of Delaware that subjective understandings of a party to a contract which are not communicated to the other party are of no effect."); RESTATEMENT (SECOND) OF CONTRACTS § 201(2) (1981) ("Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.").

123. *Compare* Merger Agreement § 9.10 ("the Company shall be entitled to seek an injunction"), *with* Merger Agreement § 8.2(e) ("in no event shall the Company seek equitable relief").

124. Defs.' Ex. 6 (May 18 draft of Agreement).

125. Pl.'s Ex. 3; Swedenburg Test. at 127, Dec. 18, 2007.

of the proposed changes that RAM initially made.[126] Although RAM ultimately succeeded in striking many of the provisions entitling URI to specific performance,[127] and although RAM did modify section 8.2(e) to try to limit the availability of equitable relief, section 9.10 in the final agreement continued to speak of the Company's right to specific performance. Testimony revealed that communications between the parties routinely skirted the issue of equitable relief and only addressed it tangentially or implicitly.[128] The defendants put forth some evidence suggesting that by mid to late July Swedenburg had agreed to give up specific performance,[129] but it was not conclusive. Mr. Seitz, URI's attorney, deftly questioned RAM's chief negotiator Ehrenberg about the clarity and wisdom of his curious editing of section 9.10, a provision Ehrenberg also contends he nullified, but this did not uncover "a single 'correct' or single 'objectively reasonable' meaning' "[130] for the Agreement. Indeed, because "a review of the extrinsic evidence does not lead the Court to an 'obvious' conclusion,"[131] I must apply the forthright negotiator principle to determine the proper interpretation of this contract.

2. *Even if URI Understood the Agreement to Provide a Specific Performance Remedy, Defendants Did Not Know and Had No reason to Know of This Understanding.*

 Swedenburg, the primary draftsman and contact at Simpson, drafted the initial bid contract as part of the auction process.[132] Once the bid contract was drafted, Swedenburg sent it to Emily McNeal of UBS, who then circulated it to purchasers. This May 18 bid contract contained a specific performance provision.[133] On June 18, Ehrenberg returned a "heavy handed" mark-up.[134] After receiving Ehrenberg's comments, Swedenburg spoke with Ehrenberg in what Swedenburg described as a "largely one way conversation" in which Swedenburg articulated what URI cared about the most.[135] During this conversation, Swedenburg described to Ehrenberg the "construct" included in the draft.[136] Acknowledging that the inclusion of the reverse break-up

126. Ehrenberg Test. at 335–36, Dec. 19, 2007.

127. *See, e.g., id.* at 336.

128. *See, e.g., id.* at 380 ("In my discussions with Mr. Swedenburg, I don't recall us using the words 'specific performance.' "); *id.* at 403 ("We never talked to the issue of specific performance of the guarantee."); Skerry Test. at 512 ("But to your question, did somebody specifically say equitable relief, I don't recall."); McNeal Test. at 90 ("Q: Do you remember any discussion involving the words 'specific performance'? A: No."); Swedenburg Test. at 149 ("I don't ever recollect those words being used.").

129. *See* Defs.' Ex. 23 (Ethan Skerry's notes of July 16, 2007); Defs.' Ex. 30 (Christopher Holt's notes of July 19, 2007).

130. *U.S. West, Inc. v. Time Warner, Inc.,* 1996 WL 307445, at *10.

131. *Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 13 (Del.Ch.2003).

132. Swedenburg Test. at 123–24. Swedenburg testified that Gary Horowitz was the supervising partner at Simpson on this transaction. *Id.* at 124; *see also* Horowitz Dep. 8:2–5, Dec. 11, 2007. Horowitz engaged in no negotiations with the buyer. *Id.* 8:8–12.

133. *See* Pl.'s Ex. 3, at LS00019717 (Merger Agreement Draft, June 18, 2007).

134. Swedenburg Test. at 127. *See also* Pl.'s Ex. 3 (Email from Ehrenberg to Horowitz re: attached marked copy of Merger Agreement).

135. Swedenburg Test. at 127.

136. *Id.* at 128.

fee/specific performance construct in the draft was not "market" relative to other recent LBO transactions,[137] Swedenburg explained to Ehrenberg that this construct made sense in terms of what URI wanted to accomplish: "the deal was supposed to be that if the financing was there, that the RAM entities should have to access the financing and close the transaction. And that's why we have the specific performance the way we have it."[138] Swedenburg then told Ehrenberg that he did not expect to include "a lot" of Ehrenberg's changes in Swedenburg's revised version of the agreement.[139] No one disputes that, as of this time, URI understood the agreement under negotiation to include a specific performance remedy, which was highly valued by URI, and that RAM knew of this. After the bid contract and throughout, Swedenburg and Ehrenberg discussed changes to terms of the Agreement[140] and exchanged revised drafts.[141] No agreements were reached on these issues and the discussions continued. At this point, there is no dispute that the parties had not reached an agreement as to whether URI had a right of specific performance and that both Swedenburg and Ehrenberg were aware of each other's position.[142]

On July 16, Swedenburg discussed the July 15 version of the contract.[143] In this conversation, Swedenburg testified that the amount of the reverse break-up fee contemplated by the construct was not discussed and that he told Ehrenberg that, with respect to the rest of the construct, "we were okay with" the July 15 draft.[144] At this point, the evidence begins to reveal that URI's apparent belief that it had a specific performance right was not effectively communicated to defendants such that defendants either knew or should have known of URI's understanding of the Merger Agreement. The July 15 draft, which contains Ehrenberg's edits to Swedenburg's July 3 draft, is a pivotal moment in the drafting history of the Merger Agreement: Ehrenberg added both the "in no event shall the Company seek equitable relief" to section 8.2(e) and the infamous "subject to" section 8.2(e) language to the end of section 9.10.[145] Lest it be somehow lost in the details, it is worthwhile to highlight the potential effect of this additional language: section 8.2(e), to which URI's

137. *Id.* at 158 ("[W]e are asking for an off-market contract when it came to the specific performance, because most LBOs these days, or at least the large majority of them, have no rights of specific performance against the shell entities or otherwise. It's just a one-way specific performance against the company. So that's what I was trying to articulate to Peter in terms of why we viewed our contract as being off-market in that respect.").

138. *Id.* at 128–130.

139. *Id.* at 130.

140. *See id.* at 133–34.

141. *See* Pl.'s Ex. 176 (Merger Agreement Draft, July 2, 2007).

142. *See* Swedenburg Test. at 136 ("It's-it's kind of-it was a broken record on both sides at this point in terms of what was said. I again articulated our view of why we thought [specific performance] was important the way we had it drafted and why it made sense. And Mr. Ehrenberg again expressed unwillingness to go in that direction and couldn't agree to that at this point.").

143. Pl.'s Ex. 166 (Merger Agreement Draft, July 15, 2007). "[T]his is a revised version of the merger agreement that was marked against the draft that we had sent back on July 3rd right before the bid date. This was the first time the contract had been turned since July 3rd." Swedenburg Test. at 144.

144. Swedenburg Test. at 145.

145. *See* Pl.'s Ex. 166, at LS00018623, LS00018628.

section 9.10 right to specific performance is subject (under Ehrenberg's revision), *purports to specifically prohibit URI from seeking equitable relief.* Yet, to such a substantive revision that attempts to eviscerate the right to specific performance (the importance of which Swedenburg understood and had previously communicated during negotiations),[146] Swedenburg simply told Ehrenberg that "we were okay with the contract as written regarding those [specific performance] provisions."[147]

In the next draft of the Agreement, despite this statement to Ehrenberg, Swedenburg struck the words "equitable relief" in section 8.2(e).[148] Though this might indicate that Swedenburg had realized that Ehrenberg's language could be interpreted to eliminate URI's right to specific performance, the next conversation regarding the agreements shows this was not the case. For the July 19 conversation, "limitation of liability at 8.2(e)" is identified as an item on the agenda.[149] Swedenburg testified that, regarding his striking "equitable relief" from section 8.2(e), he told Ehrenberg that he "thought all of the changes were-that I had made to the last version of the contract in that section were *technical* and *nonsubstantive.*"[150] Ehrenberg objected to this deletion and the language was reinserted.[151]

At this point, even if URI in fact believed that it had a right to specific performance or I could conclude that such a belief were reasonable, I find that defendants had no reason to know of this understanding.[152] Though URI, through Swedenburg, had many opportunities throughout the negotiation process to clearly vocalize its understanding of its rights for specific performance under the Merger Agreement, URI consistently failed to communicate this to Cerberus representatives.[153] Particularly damning

146. *See, e.g.,* Swedenburg Test. at 128 (identifying the reverse breakup fee/specific performance construct as an issue "we cared about in the contract in particular"); *id.* 134 ("we thought [specific performance] was important").

147. *Id.* at 145–46 ("Q: By the way, just to go back on the conversation you had on the 16th, was specific performance discussed in that conversation? A: No, it wasn't discussed. I just—like I said, I just told Mr. Ehrenberg that we were okay with the contract as written regarding those provisions.").

148. *See* Defs.' Ex. 24, at LS 00018448 (Merger Agreement Draft, July 17, 2007).

149. Pl.'s Ex. 82 (Agenda, July 19, 2007).

150. Swedenburg Test. at 147 (emphasis added).

151. *Id.* at 148 ("[Ehrenberg] said he needed that to go back in, the sentence where it was, to which I said 'Okay. That's fine.' ").

152. URI's counsel failed to provide a basis upon which defendants reasonably could form such an understanding. *See, e.g.,* Ehrenberg Test. at 373.

> Q: At any point during the meeting, when there were discussions about incentives for Cerberus to walk away or not walk away from the deal, did anybody on the URI side ask any questions about what the Cerberus and RAM representatives were talking about?
> A: No.
> Q: Did anybody on the URI side say anything about walking away didn't make any sense because they had a specific performance right?
> A: No.
> Q: Did anybody on the URI side challenge the assertions that Cerberus would have a right to walk away from this deal?
> A: No.

153. URI's counsel's equivocal testimony regarding issues that both sides agree were important to their respective clients perhaps is indicative of the apparent deficiencies in communication and supports this Court's conclusion that URI did not give defendants a reason to know that their understanding of the Merger Agreement was different than that of URI.

is the Mayer conversation on July 19, 2007.

McNeal and Kochman testified that, on July 19, they had a conversation in which Mayer said Cerberus thought that it was buying an option in URI.[154] McNeal and Kochman were taken aback by this assertion and immediately relayed this conversation to Horowitz, URI's attorney at Simpson.[155] Horowitz, however, did nothing to dissuade Ehrenberg that Mayer's understanding of the transaction was erroneous. Horowitz stated that when he spoke with Ehrenberg, Horowitz made no reference to *any* of the following: the position that had been relayed to Horowitz that Cerberus could pay $100 million and walk away from the contract; Mayer's position that Cerberus had the right to pay $100 million and walk away from the contract; whether or not Horowitz agreed with the position that Mayer had expressed to McNeal and Kochman; whether or not there was a specific performance right under the Merger Agreement; whether or not the parties disagreed about the interpretation of the contract.[156]

> Q: Are you sure it wasn't said at that meeting: we're okay with the reverse break-up fee being the sole and exclusive remedy here?
> A: I would be surprised if I said it. But you can't be sure, I suppose.
> Q: So it's possible that that's what was said?
> A: Anything is possible.
> Swedenburg Test. at 250. *See also id.* at 265 ("Q: At any time did you say to any of the Cerberus representatives, 'I don't know why you're talking about a right to walk away from the transaction; we have a right to specific performance'? A: No, I did not.").

**154.** McNeal Test. at 94; Kochman Test. at 303–04.

**155.** McNeal Test. at 109; Horowitz Dep. at 26:11–25.

**156.** Horowitz Dep. at 26:23–29:2.

**157.** *Id.* at 27:6–8.

Horowitz also said that he did not recall that Ehrenberg said anything about these issues, except to state that Cerberus was not repudiating the contract.[157] It is unclear what, if anything, was said during this conversation but it is clear that nothing was said or done to enable this Court to find that defendants should have known that URI believed it was entitled to specific performance. I therefore conclude that the evidence demonstrates that, even if URI did believe it had a right to specific performance, defendants did not know and had no reason to know of URI's understanding of the Merger Agreement.[158]

### 3. Defendants Understood the Agreement to Bar Specific Performance and URI Either Knew or Should Have Known of This Understanding

Based on the evidence presented at trial, I find that the defendants understood the agreement to eliminate any right to specific performance and that URI either knew or should have known of defendants' understanding. Cerberus seems to have

**158.** URI contends that the post-Agreement conduct of the parties was consistent with the existence of a valid and enforceable right of specific enforcement under section 9.10 of the Merger Agreement. URI, in proffering this evidence to show that it communicated its understanding of the Agreement to defendants, specifically highlights the description of the merger in the preliminary and final proxy statement filed by URI with the SEC. *See* Proxy Statement at 69, 70. Though the final proxy may be consistent with the interpretation of the Agreement urged by URI, in light of the fact that the original draft omitted any mention of the right of specific performance and the fact that the drafting and execution of the proxy statement occurred after the signing of the Merger Agreement, I cannot conclude that this post-Agreement extrinsic evidence is indicative of the common understanding of the parties.

come to this transaction halfheartedly and unenthusiastic about committing. It took issue with a great deal of the initial draft agreement URI circulated [159] and failed to submit a bid by the proposed deadline.[160] The defendants offered a go-shop period with a lower break fee to allow URI to shop itself to other bidders without the fear of paying a huge termination fee.[161] Moreover, Cerberus lowered its bid significantly.[162] Cerberus was not acting like an eager buyer and was not willing to do this deal on the terms initially proposed by URI.

Testimony from two of Cerberus's leaders, CEO Stephen Feinberg and managing director Steven Mayer, demonstrated that the firm believed it had the ability to walk away from this agreement relatively unscathed. Indeed, Feinberg, though evidently unsure of what "specific performance" means,[163] did think "very clearly that to the extent we didn't complete the merger, that our—our liability and our—what we'd have to come up with was a hundred million and that we could not be forced to close the deal." [164] Mayer, who participated more directly in the negotiations and who reviewed the Merger Agreement both in drafts and in final form,[165] testified that he "believe[s] there was an explicit understanding that Cerberus could choose not to close the transaction for any reason or no reason at all and pay a maximum amount of a hundred million dollars." [166] In addition to the Cerberus executives, lawyers for Cerberus testified to and produced contemporaneous notes corroborating their subjective understanding that the $100 million termination fee was the "sole and exclusive" recourse available to URI in the event of a failure to close.[167]

I also find that defendants communicated this understanding to URI in such a way that URI either knew or should have known of their understanding. Initially, Cerberus conveyed its position by means of the drafts and mark-ups it sent to Swedenburg. For example, on June 18, 2007, Ehrenberg sent Simpson his initial mark-ups to the draft circulated by URI. In that mark-up, Ehrenberg wrote, "OUR CLIENT WILL NOT AGREE TO A GUARANTEE." [168] Ehrenberg also removed a provision from section 6.10 "that would have required the buyer to take enforcement actions against the lenders

159. Ehrenberg Test. at 332–36.

160. McNeal Test. at 76–77.

161. *See id.* at 85.

162. *Compare id.* at 77 ("they had verbally given us a price range of around $35 to $37 a share"), *with* Kochman Test. at 292–93 (noting that Cerberus lowered its offer to $33).

163. Stephen Feinberg Test., Trial Tr. vol. 1, 47, Dec. 18, 2007 [hereinafter "Feinberg Test. at ——"] ("I'm not an attorney and I'm not really knowledgeable what exactly 'specific performance' means.").

164. *Id.* at 47–48.

165. Steven Mayer Test., Trial Tr. vol. 2, 452, Dec. 19, 2007 [hereinafter "Mayer Test. at ——"].

166. *Id.* at 446–47; *see also id.* at 466 ("As of July 22nd, specific performance wasn't even a concept that I had even entertained as being a possibility.").

167. *See* Defs.' Ex. 22 (Ehrenberg's notes of July 16, 2007); Defs.' Ex. 23 (Skerry's notes of July 16, 2007); Defs.' Ex. 30 (Holt's notes of July 19, 2007). These notes all reflect their authors' understanding that URI was "OK" with the "sole and exclusive remedy" of the termination fee. *See also* Ehrenberg Test. at 401 ("8.2(e) was designed to say no specific performance of the merger agreement").

168. Defs.' Ex. 9, at LS00019728; Ehrenberg Test. at 333.

and other persons providing the financing."[169] Finally, Ehrenberg struck portions of section 9.10(b) that would have allowed URI to specifically enforce the Equity Commitment Letter and the Guarantee and to specifically enforce the consummation of the transaction.[170] While discussing these, Swedenburg told Ehrenberg that he would likely not incorporate many of the changes, would send it back, and would expect Cerberus's next mark-up to be "less voluminous."[171]

Nevertheless, Ehrenberg persisted. In a conversation that occurred sometime between June 25 and July 10, Ehrenberg and Swedenburg discussed the extent of the defendants' potential liability. During this conversation, Swedenburg indicated "that it was important for his client to assure that ... Cerberus and the RAM entities showed up at the closing."[172] Ehrenberg "explained to Mr. Swedenburg that that was a significant problem."[173] At a July 10 meeting of the attorneys, it was decided that the issue of liability needed to be decided by the principals, but that Cerberus would be willing to enter a limited guarantee agreement.[174]

The next important meeting occurred on July 12, 2007. There, via telephone, Mayer represented to the URI team that "Cerberus would not proceed with the negotiations or with the deal unless there was an arrangement where, if the Cerberus parties, to include RAM, failed to close, the obligation would be to pay a fee."[175] Both Ehrenberg and Mayer testified that the URI team agreed to this point on the twelfth.[176]

After this meeting, Ehrenberg and his team returned to the Merger Agreement and made several important revisions. The draft they produced was circulated early in the morning on July 15, 2007 along with new versions of the Equity Commitment Letter and the Limited Guarantee.[177] I find several edits significant in these documents:

1. the Equity Commitment Letter expressly disclaims any third-party beneficiaries and exceptions to allow for suit against the Cerberus entities were removed;[178]

2. the "no recourse" provisions of the Limited Guarantee were expanded to make them farther reaching;[179]

3. section 9.10 was edited to remove references to the Equity Commitment Letter and the final sentence was added to make the provision subservient to section 8.2(e);[180] and

4. section 8.2(e) was substantially rewritten to include a limitation on liability and to provide explicitly that "in no event shall the Company seek equitable relief...."[181]

---

**169.** Ehrenberg Test. at 334; Defs.' Ex. 9, at LS00019777.

**170.** Ehrenberg Test. at 334; Defs.' Ex. 9, at LS00019793.

**171.** Swedenburg Test. at 131.

**172.** Ehrenberg Test. at 338.

**173.** *Id.* at 339.

**174.** *Id.* at 348–49.

**175.** *Id.* at 352; Mayer Test. at 428–29.

**176.** Ehrenberg Test. at 352; Mayer Test. at 429–30. *But see* McNeal Test. at 86; Swedenburg Test. at 142.

**177.** *See* Defs.' Ex. 20.

**178.** *Id.* at LS00056180; Ehrenberg Test. at 360–61.

**179.** Defs.' Ex. 20, at LS00056185–86.

**180.** *Id.* at LS00056095–96.

**181.** *Id.* at LS00056091.

Although, as discussed above, these edits do not provide a perfectly clear expression of RAM's position that the agreement bars specific performance, they are substantial enough that they should have at least put Swedenburg and URI on notice that RAM had a different understanding than URI did. Subsequent communications between the parties go substantively beyond this, and unquestionably convey RAM's position.

Swedenburg made very few changes to this draft. He struck the provision about the Company's ability to "seek equitable relief," [182] but he ultimately did not stand by this revision. When Ehrenberg received Swedenburg's edits, he circulated an agenda for a meeting to discuss the Merger Agreement. On that agenda, Ehrenberg listed "limitation of liability in 8.2(e)" as a topic for discussion,[183] and by this he "intended to address the deletion of the words equity relief." [184] At that meeting, Mr. Swedenburg spent his time lobbying for a higher break-up fee, one that would be "painful," because the potential reputational harm Cerberus would suffer from walking away would not be enough to deter them from doing so.[185] Perhaps more importantly, the RAM attorneys also explained to Swedenburg the importance of the words "equitable relief" that Swedenburg had stricken from the Merger Agreement: "it was important for us that the language that he struck be restored to reflect the agreement that the only remedy available to United Rentals, if Cerberus didn't proceed with the closing, was the break-up fee—reverse break-up fee." [186] Testimony indicated that Swedenburg put up no fight on this issue. He tersely replied, "I get it." [187]

I find this testimony to be credible and I find that it is supported by certain of defendants' exhibits and by Swedenburg's testimony. First, the agenda that Ehrenberg circulated specifically references section 8.2(e).[188] Second, Holt's notes from the July 19 meeting support the proposition that this conversation happened and that Swedenburg assented.[189] Third, Swedenburg essentially capitulated on this point during cross examination. Conceding that he quickly assented to the reinsertion of the language he had removed from section 8.2(e), Swedenburg then testified that he knew "equitable relief included specific performance," [190] that this was "probably why [he] did strike it," [191] admitted that Ehrenberg conveyed how impor-

182. See Defs.' Ex. 24, at LS00018448.

183. Defs.' Ex. 28, at RAM00092282.

184. Ehrenberg Test. at 370.

185. Id. at 372; Skerry Test. at 494–95; Mayer Test. at 431–33. This Court has previously noted the importance of reputation in the private equity field. See Abry Partners V, L.P. v. F & W Acquisition LLC, 891 A.2d 1032, 1061 (Del.Ch.2006) ("Although there are a lot more private equity firms today than there were a decade ago, the nature of that market is still such that reputational factors are likely to be important."). Given the fact, however, that Cerberus so readily balked on this deal, query how well the firm will be able to rely on its reputation in the future. See Andrew Ross Sorkin, If Buyout Firms Are So Smart, Why Are They So Wrong?, N.Y. Times, Nov. 18, 2007, at 38 (criticizing Cerberus's buyer's remorse and claiming that "Cerberus just proved itself to be the ultimate flighty, hot-tempered partner").

186. Skerry Test. at 497.

187. Id.

188. See Defs.' Ex. 28, at RAM00092282.

189. See Defs.' Ex. 30, at RAM00004472.

190. Swedenburg Test. at 252.

191. Id.

tant that provision was to Cerberus,[192] and then concluded by suggesting he knew it would have been a good idea to inquire further about why this provision was so important to Cerberus, but that he failed to so inquire because it "was at the end of an agenda, there was [sic] more negotiations to go, et cetera, et cetera." [193] I find it frankly incredible that Swedenburg could have recognized the import of the language he was striking and that Cerberus considered that language key but manifestly failed to make any further inquiry. Swedenburg, the original architect of this transaction, testified that one lynchpin of his "construct" was the seller's ability to force the sale to close.[194] By the end of this July 19 meeting, Swedenburg either knew or should have known that Cerberus's understanding of the Agreement was fundamentally inconsistent with that construct.

If Swedenburg's faltering on July 19 were not enough to put URI on notice of Cerberus's understanding, the July 21 telephone conversation between the UBS representatives (McNeal and Kochman) and Mayer surely was. On that call, May-er mentioned something about Cerberus's ability to walk away from the deal.[195] Kochman responded forcefully, declaring that his client, URI, would never agree to this deal if it were merely an option.[196] Mayer reassured him that Cerberus was committed to the deal, but never conceded that the contract amounted to anything other than an option.[197] McNeal and Kochman reported this conversation to Horowitz, and Brad Jacobs, then-CEO/Chairman of URI.[198] Horowitz, who evidently cannot remember much of this deal, failed to raise this issue with Swedenburg,[199] the chief negotiator, or with Ehrenberg.[200] On July 22, the very next day, the Agreement was executed. At that time, I conclude that URI had ample reason to know that Cerberus understood the Agreement to bar the remedy of specific performance.

## V. CONCLUSION

Although some in the media have discussed this case in the context of Material Adverse Change ("MAC") clauses,[201] the dispute between URI and Cerberus is a good, old-fashioned contract case prompt-

**192.** _Id._ at 255.

**193.** _Id._ at 256.

**194.** _Id._ at 128–30.

**195.** Mayer Test. at 434–35; Kochman Test. at 303.

**196.** Kochman Test. at 303–04.

**197.** _Id._ at 313–15; Mayer Test. at 436 (admitting he tried to reassure the UBS team by telling them "just because we had a walk-away right, didn't mean we intended to exercise it").

**198.** McNeal Test. at 109.

**199.** Swedenburg Test. at 268.

**200.** Horowitz Dep. 27:2–29:10.

**201.** _See, e.g.,_ Jack Welch & Suzy Welch, _Behind all those Undone Deals: Nervous Dealmakers are Trying to Use Loosely Written Escape Clauses to Bail Out_, Business Week, Dec. 17, 2007, at 84 ("Fast forward, then, to an adverse change—like the subprime crisis—and you understand why so many companies are engaged in legal slugfests over what their MAC clauses technically allow. Sallie Mae and the private equity firm J.C. Flowers could be in court for years, for instance, as could Cerberus and United Rentals."). This Court has, of course, served as the forum for several disputes over MAC clauses. _See, e.g., Frontier Oil v. Holly Corp.,_ C.A. No. 20502, 2005 WL 1039027 (Del.Ch. Apr. 29, 2005) (interpreting a material adverse effect ("MAE") clause); _In re IBP, Inc., S'holders Litig.,_ 789 A.2d 14, (Del.Ch.2001).

ed by buyer's remorse.[202] As with many contract disputes, hindsight affords the Court a perspective from which it is clear that this case could have been avoided: if Cerberus had simply deleted section 9.10(b), the contract would not be ambiguous, and URI would not have filed this suit. The law of contracts, however, does not require parties to choose optimally clear language; in fact, parties often riddle their agreements with a certain amount of ambiguity in order to reach a compromise.[203] Although the language in this Merger Agreement remains ambiguous, the understanding of the parties does not.

One may plausibly upbraid Cerberus for walking away from this deal, for favoring their lenders over their targets, or for suboptimal contract editing, but one cannot reasonably criticize the firm for a failure to represent its understanding of the limitations on remedies provided by this Merger Agreement. From the beginning of the process, Cerberus and its attorneys have aggressively negotiated this contract, and along the way they have communicated their intentions and understandings to URI. Despite the Herculean efforts of its litigation counsel at trial, URI could not overcome the apparent lack of communication of *its* intentions and understandings to defendants. Even if URI's deal attorneys did not affirmatively and explicitly agree to the limitation on specific performance as several witnesses allege they did on multiple occasions, no testimony at trial rebutted the inference that I must reasonably draw from the evidence: by July 22, 2007, URI knew or should have known what Cerberus's understanding of the Merger Agreement was, and if URI disagreed with that understanding, it had an affirmative duty to clarify its position in the face of an ambiguous contract with glaringly conflicting provisions. Because it has failed to meet its burden of demonstrating that the common understanding of the parties permitted specific performance of the Merger Agreement, URI's petition for specific performance is denied.

IT IS SO ORDERED.

---

**202.** Indeed, defendants have admitted that they have breached the Merger Agreement and seek no protection from the Agreement's MAC clause.

**203.** *See* Richard A. Posner, *The Law and Economics of Contract Interpretation,* 83 Tex. L. Rev. 1581, 1583 (2005) ("Deliberate ambiguity may be a necessary condition of making the contract; the parties may be unable to agree on certain points yet be content to take their chances on being able to resolve them, with or without judicial intervention, should the need arise.").