COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

October 20, 2015

Kate R. Buck, Esquire
McCarter & English, LLP
405 N. King Street, 8th Floor
Wilmington, DE 19801

Brock E. Czeschin, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

Re: *Intrepid Investments, LLC v. Selling Source, LLC*
C.A. No. 8261-VCN
Date Submitted: June 30, 2015

Dear Counsel:

In August 2010, Defendant Selling Source, LLC ("Selling Source") acquired assets (the "Acquired Businesses") from Plaintiff Intrepid Investments, LLC ("Intrepid").[1] The Transaction and Purchase Agreement (the "Purchase

---

[1] Affiliates of both Intrepid and Selling Source were involved. The role of the affiliates is immaterial to the current dispute. The other selling entities later assigned their equity interests in Selling Source to Intrepid. Thus, all references to the selling side are only to Intrepid and are made without regard to whether the events occurred before the consolidation of equity interests.

Agreement") prescribed the terms of the acquisition.[2]  At the same time, the parties

executed the Second Amended and Restated Limited Liability Company Operating

Agreement of Selling Source (the "LLC Agreement").[3]  Selling Source did not pay

Intrepid at that time for the Acquired Businesses, the profitability of which was in

doubt.  Intrepid agreed to "earn out" consideration that would involve a Purchase

Consideration Note and an equity interest in Selling Source which would be based

upon future financial performance of the Acquired Businesses.[4]  Intrepid is the

only Class B Member of Selling Source and, at the outset, received a contingent

15% equity interest.[5]  That gave Intrepid ownership and participation rights, but its

equity interest would eventually depend upon the performance of the Acquired

Businesses during calendar year 2011.

Intrepid is entitled to a Tax Distribution from Selling Source "as promptly as

reasonably practicable but in no event more than forty-five (45) days following the

end of each fiscal quarter of each calendar year, to the extent of cash and cash

---

[2] Aff. of Michael Brant in Supp. of Selling Source, LLC's Br. in Supp. of its Mot. for Summ. J. ("Brant Aff.") Ex. B (Purchase Agreement).
[3] Brant Aff. Ex. C (LLC Agreement).
[4] Purchase Agreement § 2.4.
[5] Verified Compl. ("Complaint" or "Compl.") ¶ 15.

equivalents on hand of, or funds available under credit facilities to, the Company."[6]

Each Member's share of the Tax Distributions is based upon "a portion of such

Member's Presumed Tax Liability as estimated for such fiscal quarter."[7]  If the

Presumed Tax Liability is not estimated properly, additional amounts may be paid

or subsequent distributions withheld to account for the estimating inaccuracy.

A Member's Presumed Tax Liability is defined in the LLC Agreement as

"an amount equal to the product of (a) the net amount of all taxable income

allocated by [Selling Source] to such Member for such Fiscal Year, including,

without limitation, any taxable income allocated to a Member pursuant to

Sections 4.1 and 4.3.2 and pursuant to Section 704(c) of the [Internal Revenue]

Code, and (b) 45.5%."[8]  Selling Source's initial Tax Distributions were allocated

70% to the Class A Members and 30% to the Class B Member(s).  The parties

dispute whether that allocation reflects Section 5.3.1(f) (or other provisions) of the

LLC Agreement or Selling Source's calculations using projections provided by

---

[6] LLC Agreement § 5.1.  The term "Company" refers to Selling Source.
[7] *Id.*
[8] LLC Agreement art. 15 at 55.  The LLC Agreement defines and allocates Profits and Losses differently from Presumed Tax Liability.  *See* LLC Agreement § 5.3.

Intrepid which evidently turned out to have been unduly optimistic. The eventual allocation of Class A units and Class B units would be based on the relative value (as a ratio) of the Acquired Businesses as compared to Selling Source's assets before the combination. This "Earn-out Adjustment" would be based on how the earnings generated by Selling Source's preexisting business during the Earn-out Period (2011) (the "Class A Contingent Value") compare to the earnings generated by the Acquired Businesses during the same period (the "Class B Contingent Value").[9] The LLC Agreement's objective was eventually to reallocate Profits and Losses and Tax Distributions after the Earn-out Adjustment was completed in a manner that would reflect the Members' eventual pro rata ownership rights. After the Earn-out Adjustment, in accordance with Section 4.3.2 of the LLC Agreement:

> there shall be a special allocation of Profits and Losses, as the case maybe [sic], . . . (the "Special P&L Allocation"), in the year in which the Earn-out Adjustment is completed, so that the aggregate of the Profits or Losses allocated for the periods prior to the Earn-out Adjustment plus the Special P&L Allocations equal the Profits and Losses that would have been allocated to the Members for the periods before the Earn-out Adjustment if the Profits and Losses for such

---

[9] *See* LLC Agreement § 2.6; Purchase Agreement § 2.6; *see also* Purchase Agreement at DA-3, DA-4 (defining "Class A Contingent Value" and "Class B Contingent Value").

periods were allocated in accordance with the allocation of Profits and Losses immediately after the Earn-out Adjustment.

The LLC Agreement further addressed distributions to Selling Source's Members:

Notwithstanding anything to the contrary in this Agreement, if there is an Earn-out Adjustment, and as a result, the distributions of Available Cash Flow (including Tax Distributions) to the Members (prior to the Earn-out Adjustment) were made in a manner differently than distributions of Available Cash Flow (including Tax Distributions), would have been made in accordance with Section 5.2 based on the total number of Units held by the Members immediately after the Earn-out Adjustment, then, there shall be a special distribution (the "Special Distribution") to the Members as soon as possible after the Earn-out Adjustment is completed, so that the aggregate of distributions, including Tax Distributions plus the Special Distribution equal the distributions that would have been made if the distributions for all periods were allocated in accordance with the allocation of distributions immediately after the Earn-out Adjustment.[10]

As a general matter, the Class B Member was treated as if it held a 15% interest until the Earn-out Adjustment. Nonetheless, for some time, Tax Distributions were allocated 30% to Intrepid. Distributions during the Earn-out Period would be adjusted by the allocations, a "truing up," to put the Members in the position they would have been in if they had held their ultimate percentages the entire time.

---

[10] *See* LLC Agreement § 5.3.2.

After receiving Selling Source's "Contingent Value Calculations" and reviewing certain financial information provided to it by Selling Source, Intrepid objected to the numbers generated by Selling Source and, in accordance with the Purchase Agreement, initiated an arbitration proceeding before the "Independent Accounting Firm" that was to resolve any objections. The Earn-out Adjustment arbitration took longer than anticipated, but the outcome of that process was essentially that Intrepid was found to own a 1.6% interest in Selling Source.[11] Intrepid challenged the arbitration award in the courts of New York, which confirmed the arbitration outcome.[12]

Intrepid essentially seeks an order requiring Selling Source to pay it 30% of the aggregate distributions disbursed in several fiscal quarters preceding the Earn-out Adjustment.

* * *

Selling Source has moved for summary judgment. Summary judgment may be granted if "there is no genuine issue as to any material fact and . . . the moving

---

[11] Brant Aff. Ex. A.

[12] *Intrepid Invs., LLC v. Selling Source, LLC*, Index No. 654309/2013, Decision and Order (N.Y. Sup. Ct. Feb. 18, 2015).

party is entitled to a judgment as a matter of law."[13]  In considering a motion for summary judgment, "the Court reviews all of the evidence in the light most favorable to the non-moving party."[14]  Contract interpretation disputes are appropriate for disposition by summary judgment if "the language at issue is clear and unambiguous."[15]  "[A] contract's construction should be that which would be understood by an objective, reasonable third party."[16]

\* \* \*

In its 20-page complaint, Intrepid's claim boils down to an entitlement to 30% of all Tax Distributions before the Earn-out Adjustment.[17]  Intrepid does not develop its theory for how to interpret the LLC Agreement to provide for an automatic payment of 30% of the Tax Distributions to it in an effective manner.  It looks to Section 4.1 of the LLC Agreement in search of a "taxable income

---

[13] Ct. Ch. R. 56(c).

[14] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[15] *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334 (Del. 2012); *see also Barton v. Club Ventures Invs., LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 19, 2013).

[16] *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007).

[17] *See* Compl. ¶ 55 ("Selling Source breached Section 5.1 of the [LLC Agreement] by failing to make the required Tax Distributions to Intrepid for Q2 2012 and Q3 2012"); *see also* Compl. ¶ 67.

allocation methodology."[18] Section 4.1, however, allocates Profits and Losses. The allocation of Tax Distributions requires review of Section 5.1 of the LLC Agreement which provides for distribution of "Presumed Tax Liability." That section sets forth a formula that considers an allocation of taxable income not only in accordance with Section 4.1 and Section 4.3.2 of the LLC Agreement, but also pursuant to Section 704(c) of the Internal Revenue Code.

By Section 704(c), allocations of "income, gain, loss and deduction with respect to property contributed to the partnership by a partner shall be shared among the partners so as to take account of the variations between the basis of the property to the partnership and its fair market value at the time of the contribution."[19] In addition, the so-called remedial method to allocate taxable income was adopted by the parties.[20] This allows for consideration of the variations between the basis of the contributed property to Selling Source and its fair market value and how the basis of the entity's assets would be allocated among the Members who contributed and those who did not. The difference between the

---

[18] Compl. ¶ 27.
[19] 26 U.S.C. § 704(c)(1)(A).
[20] *See* LLC Agreement § 4.3.1.

basis of the Acquired Businesses and Selling Source's pre-combination as compared to the respective fair market values at that time would have resulted in a different share of taxable income under Section 704(c) than the share of "Profits" that could have been allocated under Section 4.1 of the LLC Agreement. Calculations such as these are necessary to determine Intrepid's share of the Tax Distributions. Intrepid has not sought to show that Selling Source improperly calculated Intrepid's Presumed Tax Liability. Because of the way in which Intrepid set forth its claim, the Court is simply called upon to determine whether or not the LLC Agreement entitled Intrepid to 30% of the Tax Distributions made before the Earn-out Adjustment,[21] but Intrepid has not shown how the 30% is

---

[21] The Complaint offers no percentage for the distributions other than the 30% to which Intrepid claims entitlement and it offers no methodology for calculating a number other than 30%. *See* Compl. at 19 ("Intrepid is entitled to receive 30% of all aggregate allocations of . . . Tax Distributions . . . prior to the occurrence of the Earn-out Adjustment . . . ."); Compl. at 20 (Intrepid is entitled to "distribution . . . based on [its] original rights as the sole Class B Member . . . (30% of $4,610,022) . . . (30% of $4,461,056) . . . (30% of aggregate distributions)"); Compl. ¶ 28 ("[F]or all periods prior to the occurrence of the Earn-out Adjustment, the Profits and Losses allocated per Section 4.1 are to be allocated . . . 30% to the Class B Members . . . ."); Compl. ¶ 43 ("Intrepid should have received 30% of the aggregate distributions of . . . ."); Compl. ¶ 49 ("Intrepid should have received 30% of the aggregate distributions of . . . ."); Compl. ¶ 54 ("Selling Source breached

obtained.  Moreover, it would have been very simple to have drafted an allocation of 70% to Class A Members and 30% to the Class B Member.  That the parties did not take such a straightforward path tends to support the conclusion that the 70%/30% allocation was not intended anyway.[22]

Because there is no dispute of material fact, except for one regarding Cash Distributions as set forth below, and because controlling contractual provisions are not ambiguous and must be read as Selling Source argues, summary judgment will be entered in favor of Selling Source on the claims asserted in the Complaint, except for Intrepid's claims regarding Cash Distributions.[23]

---

Section 4.1 . . . by unilaterally changing the allocation of Profits and Losses from . . . 30% to Class B Members . . . ."); Compl. ¶ 66 (again referring to Intrepid's right to 30% of the allocation of Profits and Losses before the Earn-out Adjustment).

[22] The LLC Agreement, at Section 5.3.1(f), does allocate certain Profits from the period before the Earn-out Adjustment on the basis of 70% to the Class A Members and 30% to the Class B Member.  That allocation is of Profits and not of Tax Distributions.  More importantly, that section only applies if all, or substantially all, of the assets of Selling Source are sold or there are proceeds attributable to a financing.  Neither of those circumstances has occurred.

[23] This case raises some interesting questions about how to read a complaint. Intrepid claims entitlement to certain payments, but the governing contract language does not support that specific contention.  Maybe Intrepid is entitled to some payment, but the Complaint cannot be fairly read to suggest how that

Because the Complaint is focused on Tax Distributions, the Court has also focused on them. Intrepid's claim to Tax Distributions has been resolved, but the Complaint also references (although only minimally) Cash Distributions.[24] Some of the references to Cash Distributions—"to the extent that any of the distributions paid to the Class A Members . . . were in fact Cash Distributions"[25]—do not allege a right to Cash Distributions or even that Cash Distributions were ever made. In order for Cash Distributions to have been made, the director appointed by Intrepid would have had to have voted for them.[26] Indeed, Selling Source insists that no Cash Distributions were ever made[27] and because they must have been made out of Profits and Selling Source suffered financially, that seems plausible. Yet, the

payment is to be determined. Intrepid also complains about a lack of information. There may be some merit to that plea, but the Complaint does not seek an inspection of any of Selling Source's books and records. Discovery is usually available to flesh out the details of the claim that a plaintiff has asserted, but the factual basis for the claim must be set forth in the complaint. In short, the information which Intrepid complains about not having would not change the Court's conclusion that Intrepid's Complaint fails under a summary judgment standard with respect to the Tax Distributions. *See infra* **note 30** and accompanying text.

[24] Cash Distributions are paid in accordance with § 5.2 of the LLC Agreement.

[25] Compl. ¶¶ 43, 56.

[26] LLC Agreement § 5.2.

[27] Transcript of Oral Argument ("Tr.") (June 30, 2015) at 10–11.

Complaint may fairly be read to allege "that during July 2012, Selling Source made Tax Distributions and/or Cash Distributions . . . ."[28]  Intrepid's use of "and/or" as linking Tax Distributions and Cash Distributions creates a disputed fact as to whether Cash Distributions were ever made.[29]  If Cash Distributions were made, then by Section 5.2 of the LLC Agreement, Intrepid would have been entitled to 30%.  Even though there is a waterfall provision not tied to 30%, the initial cash portion of the Cash Distribution would have been subject to the 30% allocation to Intrepid's benefit.  Thus, even though it seems highly unlikely that there ever was any payment of a Cash Distribution, the factual question lingers.

\* \* \*

Intrepid invokes Court of Chancery Rule 56(f) in an effort to avoid the grant of summary judgment in favor of Selling Source.[30]  It argues that it needs to develop additional facts; it focuses on how Selling Source made the Tax

---

[28] *See* Compl. ¶ 41.

[29] Intrepid's counsel also has insisted that Cash Distributions may have been made. Tr. at 18.

[30] Court of Chancery Rule 56(f) provides in part: "Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the Court may refuse the application for judgment . . . ."

Distribution calculations. The issues which it has identified are not material to the Court's summary judgment decision, in large part because those are not issues upon which Intrepid's claims, as pled in the Complaint, depend. The discovery that Intrepid seemingly seeks would delve into whether Selling Source made errors in its calculation of the proper Tax Distributions to Intrepid. That, however, is not a question that the Court must decide in the context of Selling Source's summary judgment motion. Because discovery within the context of Rule 56(f) would not be material to the Court's summary judgment decision, Intrepid's motion for relief under that rule is denied, except as to Cash Distributions.[31]

There is, however, one factual question: did Selling Source ever make Cash Distributions before the Earn-out Adjustment? That narrow and limited question must be tested in discovery. If it turns out that the record, without disputed fact, demonstrates that no Cash Distributions were made, Selling Source will be entitled to summary judgment on the remaining thread of Intrepid's claim.

---

[31] *See, e.g.*, *W. Air Lines, Inc. v. Allegheny Airlines, Inc.*, 313 A.2d 145, 152, 154 (Del. Ch. 1973) (denying motion under Court of Chancery Rule 56(f) because "[t]he agreement speaks for itself and leaves nothing to further discovery").

* * *

"Mootness arises when controversy between the parties no longer exists such that a court can no longer grant relief in the matter."[32]  Selling Source argues that this action should be dismissed as moot because any decision the Court might make in favor of Intrepid "[could] not have any practical effect on the existing controversy."[33]  With the arbitration decision, confirmed by the courts of New York, there is little doubt that Intrepid's proportional interest in Selling Source is small.   Early Tax Distribution payments were at 30%, and an inevitable "truing up" will result in a greater payment to the Class A Members and a reduction of future payments to Intrepid for some time.  Thus, if the Tax Distributions that Intrepid received had been continued at 30% until completion of the Earn-out Adjustment, the difference, based on the relative comparable equity interests, would be paid back to the Class A Members through additional payments, perhaps funded in part by reduced payments to Intrepid.  In that sense, the Court's decision

---

[32] *State Farm Mut. Auto. Ins. Co. v. Davis*, 80 A.3d 628, 632 (Del. 2013). Mootness is properly an initial inquiry.  Here, an understanding of the merits of the dispute informs the mootness analysis.

[33] *Library, Inc. v. AFG Enters., Inc.*, 1998 WL 474159, at *2 (Del. Ch. July 27, 1998).

would not likely have any practical effect on the net cash flow between the parties. However, there is the question of interest, which Intrepid has sought in the Complaint. If Selling Source were found to have breached its duty to pay 30% of the Tax Distributions to Intrepid, presumably Intrepid would be entitled to interest on the shortfall. The recapture provision does not charge the overpaid party with interest. Thus, Intrepid would have had the benefit of the overpayment for some period of time. The amount of interest would perhaps be small, but it would be a definable benefit that Intrepid would have received if it had prevailed on its claims. Thus, the arbitration result (or the true up provision) does not render Intrepid's Tax Distribution claim, as set forth in the Complaint, moot. Whether the amount of interest at stake would objectively be worth pursuing if that were the only benefit is, of course, a different question.[34]

---

[34] For the same reasons, Intrepid's claim regarding Cash Distributions is not moot. Intrepid's claim for injunctive relief to prevent Selling Source from interfering with the Earn-out Arbitration has been mooted by the issuance of the arbitration decision and its judicial confirmation.

Intrepid also contends that Selling Source breached Section 7.1(d) of the LLC Agreement when Intrepid's distributions were eliminated. Under Section 7.1(d), a majority of the Class B votes is required for a "Major Decision." Among the Major Decisions identified in the LLC Agreement is a "change in the rights of the

\* \* \*

For the foregoing reasons, summary judgment is entered in favor of Selling

Source and against Intrepid, except that Selling Source's motion is denied to the

limited extent that Intrepid seeks recovery based on Cash Distributions.[35]

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    Register in Chancery-K

---

Members with respect to allocations and distributions."  First, Intrepid seeks a declaratory judgment that the elimination of its distributions violated that provision.  To the extent that the relief would be prospective, it is moot because the Earn-out Adjustment effectively resolved any question regarding the proper magnitude of its interest in Selling Source.  Second, to the extent that retrospective relief is sought under this claim—and this is not clear—Intrepid's "rights"—at least as that term is viewed as the equivalent of contractual rights—were not affected because there was no right to payment of 30% of the Tax Distributions.

[35] With this conclusion, Selling Source's Motion to Stay Discovery is denied as moot, except to the extent that Intrepid seeks discovery regarding Cash Distributions.  As for Cash Distributions, the Motion to Stay Discovery is granted except as to the question of whether Cash Distributions were made before the Earn-out Adjustment.  Discovery regarding that limited issue may go forward.  If it turns out that Cash Distributions were made, then additional discovery into those distributions will likely become necessary.